[Crim. No. 7250.    Second Dist., Div. One.    Feb. 3, 1961.]

THE PEOPLE, Appellant, v. ROBERT LEE BYARS et al.,
Respondents.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Paul W. Davis, District Attorney, and Robert N. Tait, Deputy District Attorney, for Appellant.

Charles E. Ogle for Respondents.

LILLIE, J.—The last 13 counts of a 16-count indictment were set aside on defendants' motion; the lower court found there was no competent evidence to support reasonable cause. The People appeal from the order. Count I charging a conspiracy of three defendants to present false claims for payment, and Counts II and III alleging separate violations of section 72, Penal Code, are not here involved.

Counts IV through XV accuse one Byars, a ''person charged with the receipt and safekeeping and transfer of public moneys of the San Luis Obispo County Water District No. 2,'' of appropriating public moneys ranging from $5.00 to $116.28 to his own use and for the use of another, in violation of section 424, subdivisions 1 and 2, Penal Code. Count XVI charges Byars and one Eidson with conspiracy and alleges that at various times they conspired to appropriate to their own use various sums of public moneys.

■■■ While all that is required by way of evidence to support an indictment is a reasonable probability of defendant's guilt, the evidence upon which it is found must be competent and admissible (*Dong Haw* v. *Superior Court,* 81 Cal.App.2d

153 [183 P.2d 724]; *McFarland* v. *Superior Court,* 88 Cal. App.2d 153 [198 P.2d 318]); thus, when the only evidence produced against a defendant is incompetent and inadmissible, there exists no reasonable or probable cause to hold him. "The proof which will authorize a magistrate in holding an accused for trial must consist of legal, competent evidence. No other type of evidence may be considered by the magistrate. The rules of evidence require the 'production of legal evidence' and the exclusion of 'whatever is not legal.' " (*People* v. *Schuber,* 71 Cal.App.2d 773, 775 [163 P.2d 498].)

The same applies to evidence received before the grand jury to support an indictment (*People* v. *Flanders,* 140 Cal. App.2d 765 [296 P.2d 13]) and if the competency of the evidence is challenged, then it becomes a matter reviewable on a motion to set aside the indictment under section 995, Penal Code. (*People* v. *Soto,* 144 Cal.App.2d 294 [301 P.2d 45].) Thus if the only evidence against Byars and Eidson is hearsay or otherwise inadmissible, and incompetent, leaving no evidence that a crime has been committed (*People* v. *Jablon,* 153 Cal. App.2d 456 [314 P.2d 824]) or none to connect them with the offenses charged (*Jensen* v. *Superior Court,* 96 Cal.App.2d 112 [214 P.2d 828]), the indictment must be set aside.

Inasmuch as our only concern is whether there is any legal, competent evidence to support the indictment (*People* v. *Schuber,* 71 Cal.App.2d 773 [163 P.2d 498]; *People* v. *Soto,* 144 Cal.App.2d 294 [301 P.2d 45], *Greenberg* v. *Superior Court,* 19 Cal.2d 319 [121 P.2d 713]), we summarize in pertinent detail the evidence received in connection with each count. The testimony offered to the grand jury is somewhat brief considering the nature of the accusations, although numerous documents in the form of invoices, cancelled checks, bank deposit slips and official receipts were received in evidence.

Relative to the allegation in each count that Byars was then a "person charged with the receipt and safekeeping and transfer of public moneys of the San Luis Obispo County Waterworks District No. 2," a certified copy of the original resolution of the Board of Supervisors dated February 15, 1937, (Ex. 102) establishing rules and regulations for San Luis Obispo County Waterworks District Number 2 providing rates, billing, penalties, charges, refunds and that "[a]ll sums collected by the superintendent shall be certified to the County Auditor and deposited with the County Treasurer at least once every month," and a certified copy of the original order

of the Board appointing Byars as superintendent of Waterworks District Number 2, effective October 21, 1946, (Ex. 102), were received; and the county auditor testified from the certified county payroll that Byars and Eidson were "regular, full-time employees during the months of July, August and September, 1958."

Count IV charged Byars with appropriating $81 to his own use and the use of another. The administrator of the Morro Union Elementary School received an invoice for $132 dated August 27, 1958, from Waterworks District Number 2, for installation of sewer lines (Ex. 4-A); in payment thereof he drew a School warrant for $132 dated September 5, 1958, in favor of the Waterworks District (Ex. 4-B), which was later stamp-endorsed "County of San Luis Obispo Waterworks District No. 2, Robert L. Byars, Sup't"; the official receipt book of Waterworks District Number 2 discloses a carbon copy of an official receipt crediting the school with $51 on October 10, 1958, (Ex. 4-C) "On Account of Water Consumed Between Reading Dates" and bearing the notations "Miscel. Receipt" and "R. L. Byars," in handwriting with several initials below the name; and on October 10, 1958, Waterworks District Number 2 deposited to its account in the bank the school warrant for $132 (Ex. 4-D).

The evidence received in connection with Count V charging Byars with appropriating $10 for his own use July 18, 1958, reveals that Mike St. John received an invoice from Waterworks District Number 2 in the sum of $17.50 dated July 1, 1958, (Ex. 5-A); a check in payment thereof payable to the county of San Luis Obispo in the amount of $17.50 was issued July 17, 1958, (Ex. 5-B); an official receipt in the office of the county auditor dated July 18, 1958, credited St. John with $7.50 (Ex. 5-C); and on July 18, 1958, Waterworks District Number 2 deposited in the bank to its account St. John's check in the sum of $17.50 (Ex. 5-D).

Count VI alleged that Byars on July 21, 1958, appropriated $10 to his own use and the use of another. The evidence shows that the Harbor Supply Company received an invoice from Waterworks District Number 2 dated July 1, 1958, in the amount of $15 (Ex. 6-A) and a water bill dated 6/1—7/1 in the sum of $3.50 (Ex. 6-F); in response thereto the company paid $18.50 to Waterworks District Number 2 by check dated July 10, 1958, (Ex. 6-B), which was deposited by it in the bank on July 23, 1958, (Ex. 6-E); and an official receipt in the auditor's office shows that first on July 18, 1958, Water-

works District Number 2 credited Harbor Supply Company with $15 but marked the same "Void" (Ex. 6-C), that later on, July 21, 1958, another receipt was made out in the amount of $5.00 (Ex. 6-D).

In connection with Count VII accusing Byars of appropriating to his own use $15 on September 2, 1958, the evidence reveals that Harbor Supply Company on August 15, 1958, received an invoice for $19 (Ex. 7-A) ; that it paid the amount by a $19 check made payable to Waterworks District Number 2 dated August 26, 1958, (Ex. 7-B) ; that the receipt book shows the company was credited with $4.00 on September 2, 1958, (Ex. 7-C) ; and that the check for $19 was deposited in the bank on September 3, 1958, (Ex. 7-D).

Count VIII charged defendant with appropriating $30 to his own use on September 5, 1958. Waterworks District Number 2 sent to Morro Rock Mutual Water Company an invoice for $38, dated August 15, 1958, (Ex. 8-A) ; it paid by a $38 check dated September 1, 1958, (Ex. 8-B) ; Waterworks District Number 2 deposited the $38 check in the bank on September 5, 1958; and on September 8, 1958, by official receipt it credited the Morro Rock Mutual Water Company with receiving $8.00 (Ex. 8-C).

Count IX charged an appropriation of $30 to defendant's own use on December 2, 1958. The evidence shows that an official county claim with an invoice from Waterworks District Number 2 purportedly signed by Byars, dated November 13, 1958, in the sum of $63.51 (Ex. 9-A) attached thereto, was received in the office of the county auditor; in payment thereof, a county warrant in the sum of $63.51 was drawn December 1, 1958, in favor of Waterworks District Number 2 (Ex. 9-B) ; an official receipt (Ex. 9-C) credited the county with $33.51 December 2, 1958; and the $63.51 warrant was deposited in the bank December 4, 1958.

In connection with Count X accusing Byars of appropriating $5.00 to the use of another, the evidence discloses that Noyes Realty Company received an invoice on December 9, 1958, for $9.00 from Waterworks District Number 2 (Ex. 10-A) ; that it paid the same by check dated April 17, 1958, in the sum of $9.00 (Ex. 10-B) which was deposited in the bank by Waterworks District Number 2, April 21, 1958 (Ex. 10-D) ; and that it credited Noyes Realty Company with receipt of $4.00 on April 20, 1958 (Ex. 10-C).

In connection with Count XI, charging defendant with appropriating $30 for his own use on September 21, 1959,

Albert Steinhauer testified that for $100 he bought wood from an old tank from Waterworks District Number 2 and paid for it by a $100 check dated September 21, 1959, payable to Bob Byars, later stamp-endorsed by Waterworks District Number 2 (Ex. 11-A), which check was deposited in the bank by it on September 23, 1959 (Ex. 11-D); he said he was never given an invoice therefor, although an invoice (Ex. 11-B) in the official file discloses ''Albert Steinhauer, Wood from old tank $70.00''; and an official ''miscellaneous receipt'' shows the Waterworks District Number 2 credited him with $70 (Ex. 11-C) on September 21, 1959.

In support of Count XII charging defendant with the appropriation of $116.28 to his own use on July 19, 1957, the testimony shows that Rene Simonin was billed on July 5, 1957, for $116.28, by Waterworks District Number 2 (Ex. 12-A) and that he paid the amount by check on July 5, 1957, which was deposited by Waterworks District Number 2. The official receipt book shows no receipt of moneys from Simonin.

The evidence offered in connection with Count XIII alleging Byars appropriated $96.35 on August 13, 1957, to his own use, discloses that Robert F. Mills received an invoice from Waterworks District Number 2 on August 1, 1957, for $96.35 (Ex. 13-A) which was paid by check on August 7, 1957 (Ex. 13-B) in the same amount, endorsed and deposited in the bank by Waterworks District Number 2 on August 13, 1957. The official receipt book shows no receipt of moneys from Mills.

In connection with Count XIV charging the appropriation to his own use on September 18, 1958, of $44.74, in response to an invoice dated August 8, 1958, issued by Waterworks District Number 2 to Mr. and Mrs. Bryant in the sum of $44.74 (Ex. 14-A), Thelma Bryant issued her check September 5, 1958, in the sum of $44.74 (Ex. 14-B) to Waterworks District Number 2, which was endorsed and deposited by it on September 16, 1958 (Ex. 14-C). The official receipt book shows no receipt of moneys from the Bryants.

Count XV charges defendant with having on April 21, 1958, appropriated $28 to his own use; and the evidence shows that Pacific Gas and Electric Company was issued an invoice by the Waterworks District Number 2 on March 28, 1958, in the amount of $44.41 (Ex. 15-A), which it paid by check in that sum, made payable to the county of San Luis Obispo (Ex. 15-B) on April 18, 1958; that it was endorsed by rubber-stamp endorsement ''County of San Luis Obispo Waterworks

District No. 2, Robert L. Byars, Sup't''; and that an official receipt (Ex. 15-C) credits the Pacific Gas and Electric Company with $16.41 on April 21, 1958.

Count XVI, charging a conspiracy between Byars and Eidson to appropriate public moneys, alleged three overt acts—the appropriations set forth in Counts VI, VIII and X.

Briefly the evidence shows that Byars was appointed superintendent of Waterworks District Number 2 on October 21, 1946; he and Eidson were regular, full-time employees during July, August and September 1958, and all sums Byars collected must be certified to the county auditor and deposited with the county treasurer at least once every month; that between July 1957 and September 1959, Waterworks District Number 2 issued certain invoices to named customers for which they issued checks payable to Waterworks District Number 2 in the same amounts; and that in each instance the check was stamp-endorsed ''County of San Luis Obispo Waterworks District No. 2, Robert L. Byars, Sup't'' and duly deposited by it in its official account in the bank. Hence, even were Byars to be considered either a ''public officer'' as urged by appellant, or a ''person charged with the receipt, safe-keeping, transfer, or disbursement of public moneys'' under section 424, Penal Code, it is apparent at this point in the evidence that there is a complete absence of any inculpatory facts, for the amount received by Waterworks District Number 2 on each invoice was regularly and properly deposited by it in its official account in the bank.

This brings us to a consideration of carbon copies (Exhibits 4-C, 5-C, 6-D, 7-C, 8-C, 9-C, 10-C, 11-C and 15-C) of certain receipts purportedly issued by Waterworks District Number 2 and consisting of part of an official receipt book (Ex. 101) in the possession of the county auditor, reflecting that on a specified date (in each instance, subsequent to the payment to Waterworks District Number 2 by each customer of the amount set forth in the invoices proved) Waterworks District Number 2 received other sums from the same customers. In each count in which such a receipt appears, appellant relies upon it to prove that for the payment to Waterworks District Number 2 on each invoice the customer who in each instance paid the full amount thereof did not receive credit for that, but for a lesser sum, in the official receipt book of Waterworks District Number 2 (Ex. 101) in the possession of the county auditor, and that defendant appropriated the differ-

ence between the amount paid on the invoices and the amount for which the customer was receipted.

For several reasons, these receipts are of little or no value to appellant—for they prove nothing more than that after a named customer paid the full amount of a specified invoice issued to him by Waterworks District Number 2, the county auditor, in the official receipt book of Waterworks District Number 2, gave him credit for the receipt of a different sum paid by him at a later date; and from the state of the evidence we can only conclude that the amount recorded in each receipt reflected payment on another invoice or transaction separate and apart from that proved. The evidence in no way connects the amount for which the customer was given credit in the official receipt with the amount he previously paid to Waterworks District Number 2. Only one of the official receipts on its face pertains to any specified transaction, the rest relate to no particular invoice, and the transaction referred to (Count IV) is entirely separate from that set up in the evidence. On several (Counts IV and XI), they appear on their face to be "miscellaneous" receipts. And adding to the failure of the evidence to relate the sums recorded in the receipts to any specific transaction, and in particular to the amounts charged in each count, is the obvious conflict in the amounts and dates set forth in each receipt with those appearing in the evidence in connection with the specific transaction in each count. For example, in Count IV, charging appropriation of $81, the invoice for $132 for *"sewer line construction,"* dated *August 27, 1958* (Ex. 4-A), was paid by school warrant in the sum of $132, which warrant was duly deposited by Waterworks District Number 2 in the bank, but the official receipt shows only that over a month later, the school was credited with having on *October 10, 1958,* paid $51 to Waterworks District Number 2 *"on account of water consumed between reading dates."*

Also of interest is the manner in which the official receipt book was kept. The evidence establishes that when a receipt is issued there are three slips of paper—the original (a white copy) which goes to the person paying the money, a yellow copy which goes to the county auditor with a settlement for the money, and a pink copy which remains in the book (Ex. 101). The "pink" copies constitute the "C" exhibits (photostatic copies of those appearing in the official receipt book [Ex. 101]). It is significant that no customer witness was ever asked if he received the original receipt, and if so to what

transaction or invoice it pertained or whether it was the only one ever given to him; if he ever had subsequent transactions (water, labor, materials) with Waterworks District Number 2; if he ever paid sums other than those reflected in the evidence; if he was ever issued other invoices or ever paid an additional sum in the amount reflected in the official receipt. The evidence shows that at least one customer (Harbor Supply Co.) did business on more than one occasion with Waterworks District Number 2, and it is reasonable to assume others too were "repeat" customers. Although the "pink" copies were produced by the county auditor, there is no evidence concerning what invoice or transaction was referred to by Waterworks District Number 2 in the "yellow" copy and its settlement when sent by it to the county auditor.

In addition to the lack of proof of any connection between the amounts recorded in the official receipts and the amounts paid on the invoices in evidence, there is a complete absence in the record of any evidence that defendant personally had anything to do with the handling of the funds of Waterworks District Number 2, the issuance of the invoices in question, the receipt or handling of the checks paid therefor, the deposit of these checks in the bank or the execution of the official receipts, or that he ever knew about any of these matters, or that he appropriated any funds at any time or even had an opportunity to do so. Each check was endorsed by rubber stamp and there is no proof that defendant personally deposited them in the bank or had anything to do with them. As to the official receipts, the evidence clearly shows by the testimony of Mrs. Hurd, the county auditor, that they were not only kept in the custody of the county auditor, but were actually issued by that office, completely eliminating defendant's connection with them. Moreover, it is obvious from the face of each receipt that defendant did not personally write "R. L. Byars" thereon, for beneath the name in each instance appears the initials of the person who apparently wrote Byars' name—sometimes "mc," "ccc" and "cc." There is no proof that defendant personally signed the receipts or even knew of those in question, nor is there any identification of the person who signed his name.

It should be noted that no receipts were produced in connection with Counts XII, XIII and XIV; nor does the evidence disclose that any were ever issued or that they should have been given or that defendant was under a duty to issue them and did not do so.

No relevancy between the receipts (the "C" exhibits) and the payments on specific invoices having been established up to this point, there is no evidence in the record that any money belonging to Waterworks District Number 2 was appropriated by defendant or anyone else. Thus to prove discrepancies between the amounts received on specific invoices and those reflected in the receipts and that they resulted in a shortage in the funds collected by defendant as superintendent of Waterworks District Number 2, and that defendant was responsible for this shortage by appropriating the funds to his own use, the prosecution attempted to use the "books, records and documents of Waterworks District No. 2" to establish a shortage in each specific transaction and offered what it terms in its opening brief, "extrajudicial admissions of the defendant." To do this the district attorney did not produce the "books, records and documents of Waterworks District No. 2," but in their place resorted to the testimony of a certified public accountant who at his request previously examined the books and talked to the defendants.

Milton E. Willeford, certified public accountant, testified he was licensed in California and Arizona and had been licensed since 1947; was a member of the American Institute of Certified Public Accountants, the California Society of Certified Public Accountants, and the State Committee on Governmental Accounting and an associate member of the Municipal Finance Officers Association; and that at the request of the district attorney he examined the "books, records and documents of Waterworks District No. 2." He testified that he examined the "books, records and documents pertaining" to the Morro Union Elementary School transaction (Count IV) and from his examination it was his "opinion and conclusion" that there was a "shortage" of $81, and that Byars "stated that he took the $81.00;" that he examined the books pertaining to the St. John transaction (Count V) and it was his "opinion and conclusion" that there was a "shortage," and that Byars "admitted taking it"; that he examined the "books, records, papers and documents of Waterworks District No. 2" pertaining to the Harbor Supply Co. transaction (Count VI) and it was his "opinion and conclusion" that there was a $10 "shortage," that Byars "admitted taking it" and "explained that he gave $5.00 to Mr. Eidson," and Eidson "admitted receiving the $5.00"; that he examined the "records, papers and documents" pertaining to another Harbor Supply Company transaction (Count VII) and it was his

"opinion and conclusion" that there was a "shortage" of $15, and Byars "admitted taking the $15.00"; that he examined the "books" in connection with the Morro Rock Mutual Water Company transaction (Count VIII) and he reached an "opinion and conclusion" that there was a "shortage" of $30, Byars "admitted taking the $30.00" and said "he kept $10.00 and gave $20.00 to James W. Eidson," and that Eidson "admitted receiving the $20.00"; that he examined the "records" relating to the transaction of the county of San Luis Obispo (Count IX) and it was his "opinion and conclusion" that there was a "shortage" of $30, and Byars "admitted taking the $30.00"; that he "examined the records" in connection with the Noyes Realty Company transaction (Count X) and based on his "examination, and audit" it was his "opinion and conclusion" that there was a "shortage" of $5.00, Byars "admitted taking the $5.00" and "stated that he gave it to Eidson," and that Eidson "admitted receiving the $5.00"; that he examined the "records" in connection with the Steinhauer transaction (Count XI) and it was his "opinion and conclusion" that there was a $30 "shortage," and Byars "admitted taking the $30.00"; that he examined the "books, records and papers" in connection with the Simonin transaction (Count XII) and reached the "opinion and conclusion" that there was a "shortage" of $116.28, "a shortage of the total amount of the invoice and check" that he could find no receipt; that he examined the transaction of Robert Mills (Count XIII) and based upon his "audit and examination of the records" it was his "opinion and conclusion" there was a "shortage" of $96.35, that "this was developed as a result of the audit" but since he was unable to find any receipt in that amount "the shortage of $96.35 is the total amount of the check"; that from his "examination" in connection with the transaction of Mr. and Mrs. Bryant (Count XIV) it was his "opinion and conclusion" that there was a "shortage of $33.74 [sic]" and Byars "admitted taking the $44.74"; and based on his "examination" of the Pacific Gas and Electric transaction (Count XV) it was his "opinion and conclusion" that there was a $28 "shortage" but having discovered the same as a result of an audit, he did not discuss it with Mr. Byars.

This constituted the entire testimony of Willeford—that he examined the "books, records and documents of San Luis Obispo Waterworks District No. 2" in connection with each named transaction and from his examination thereof formed

the "opinion and conclusion" that there was a "shortage" of a certain sum that Byars "admitted" taking.

The testimony of Willeford must be considered, if at all as that of an expert witness, for it is apparent from the evidence that he had no personal knowledge of any of the items or transactions recorded in the books upon which he gave his opinions, that what he knew of the transactions he learned solely from his examination of the books, and that he had no connection with the preparation, recordation or keeping of any of the entries therein—the sole basis of his opinions and conclusions was his examination and audit of the "books, records and documents of Waterworks District No. 2" (of whatever they might consist), at the request of the district attorney during his official investigation.

While meager, we do not question the testimony qualifying Willeford as an expert accountant, nor do we deem it necessary under the instant circumstances to determine whether that to which he testified is a proper subject of expert testimony, for even as an expert witness Willeford's opinion must be excluded as based entirely upon incompetent and inadmissible matters.

With the exception of the official receipt book (Ex. 101) kept by the county auditor, the "books, records and documents of Waterworks District No. 2" were neither identified in the evidence, nor produced; but we assume that they constitute the regular official books of account of Waterworks District Number 2, reflecting amounts received for water, labor and materials furnished, sums paid out and moneys certified by it to the county auditor and deposited with the county treasurer, and that they are part of the official records of the county of San Luis Obispo, and perhaps of a public nature. However we have no way of knowing and indeed there is no evidence concerning what connection, if any, defendant ever had with the "books, records or documents of Waterworks District No. 2" or with any entries made therein—in fact the proof shows beyond question that the only official book produced, a receipt book (Ex. 101), was kept in the custody of the county auditor and the receipts therefrom were issued by that office.

The evidence, in the form of invoices, cancelled checks, deposit slips and even the official receipts (which we have already excluded as irrelevant and hearsay) and the testimony of those customers involved in each transaction, discloses no incriminating circumstances; thus evidence of any inculpatory facts must come, if at all, from some other source; and the

prosecution sought to prove the same not by the best evidence —the testimony of those having personal knowledge of the events or items in the books, or of those performing their duties in connection with keeping the books or even by the books and records themselves properly identified and authenticated, but in its place offered the testimony of one, a complete stranger to the transactions and the books, who did nothing more than examine the same as an expert and give his opinion and conclusion that there was a shortage in connection with certain transactions entered therein.

The facts related in the entries recorded in the books of account and records of Waterworks District Number 2 (whether of a public or private nature) constitute hearsay, and are incompetent as evidence thereof unless they have been taken out of the ''hearsay'' category by a proper foundation having been laid for their identification or introduction in evidence by testimony relating to the identity and the mode of their preparation if of a private nature (*People* v. *Fowzer*, 127 Cal.App.2d 742, 747 [274 P.2d 471]; Code Civ. Proc., § 1953f; *People* v. *Schmidt*, 147 Cal.App.2d 222 [305 P.2d 215]; *Nichols* v. *McCoy*, 38 Cal.2d 447 [240 P.2d 569]; *Loper* v. *Morrison*, 23 Cal.2d 600 [145 P.2d 1]), or if of a public nature, by testimony that they were ''made in the performance of his duty'' by a public officer or one in the performance of a duty especially enjoined by law. (Code Civ. Proc., § 1920; *People* v. *Williams*, 174 Cal.App.2d 364 [345 P.2d 47].) It is only after such a foundation is laid that the books and records are admissible as proof of the facts recited therein. (Code Civ. Proc., §§ 1920, 1953f.) But herein the books were neither produced nor identified, nor authenticated nor received in evidence—perhaps because of their nature the entries failed to meet the requirements of the uniform act, we do not know— but for whatever reason they were not offered they were not before the grand jury and their contents constitute no more than hearsay and are incompetent for any legal use in the record before us, no matter how they were, through the testimony of the accountant, injected into the evidence. Therefore we conclude that any opinion or conclusion concerning what appears in the books must be excluded. Not having directly offered the books, the district attorney, by qualifying Willeford as an expert, attempted indirectly to put the contents of the books, so far as relevant to the transactions in question, in evidence through the accountant's opinion of what they contain. Willeford's testimony was not factual; he did not de-

scribe how or in what manner the entries appeared in the books or how they related to the transactions involved; he only gave his opinion of what the entries reflect. Moreover each opinion was based exclusively upon his examination of the "books, records and documents of Waterworks District No. 2," which books clearly consist of hearsay and inadmissible and incompetent matters; and it is the rule that where an expert witness bases his opinion entirely upon incompetent matters, or where it is shown that such incompetent matters are the chief element upon which the opinion is predicated, such opinion must be rejected. (*San Diego Land Co.* v. *Neale,* 88 Cal. 50 [25 P. 977]; *Young* v. *Bates Valve Bag Corp.,* 52 Cal.App.2d 86 [125 P.2d 840]; *Ribble* v. *Cook,* 111 Cal.App. 2d 903 [245 P.2d 593]; *Kalfus* v. *Fraze,* 136 Cal.App.2d 415 [288 P.2d 967].)

Thus the exclusion of the official receipts and Willeford's testimony leaves the record before us entirely bare of any inculpatory facts; the competent evidence, together with all inferences which could be reasonably drawn therefrom, reflect no circumstances pointing to the commission of any criminal offense and in no manner, prima facie or otherwise, establish the corpus delicti of any crime. Even were the statements of Willeford, that defendants Byars and Eidson "admitted taking" the money, not inadmissible as his conclusion and opinion of what defendants purportedly told him (*Adelstein* v. *Greenberg,* 77 Cal.App. 548 [247 P. 520]; *Cullinan* v. *Mercantile Trust,* 80 Cal.App. 377 [252 P. 647]; *Achen* v. *Pepsi-Cola Bottling Co.,* 105 Cal.App.2d 113 [233 P.2d 74]), they still could not be used as extrajudicial admissions of the defendants establishing their connection with the offenses alleged because proof of the corpus delicti of the crimes charged has failed. It is the settled rule that the corpus delicti must be established independent of the admission of the defendant (*People* v. *Cullen,* 37 Cal.2d 614 [234 P.2d 1]; *People* v. *Rupp,* 41 Cal.2d 371 [260 P.2d 1]); and any extrajudicial admissions of the defendants must be disregarded on the motion to set aside the indictment. (*People* v. *Soto,* 144 Cal.App.2d 294 [301 P.2d 45].) Moreover, investigator Tumlin's testimony that Eidson told him he knew "it was wrong for him to perform work and submit an invoice and accept payment while he was an employee of the Waterworks" and that Byar's "answers were essentially the same, that he worked there, that his crew worked with him and that he had approved these invoices and caused them to be submitted to the Morro

Union Elementary School for payment,'' is of little value to appellant for it is only through speculation that the so-called ''extrajudicial admissions'' could relate to the commission of any crime.

For the foregoing reasons the order is affirmed.

Wood, P. J., and Fourt, J., concurred.