[Civ. No. 20736. First Dist., Div. One. June 10, 1964.]

FIBREBOARD PAPER PRODUCTS CORPORATION, Plaintiff and Respondent, v. EAST BAY UNION OF MACHINISTS, LOCAL 1304, UNITED STEELWORKERS OF AMERICA, AFL-CIO, et al., Defendants and Appellants.

676

678

682

684

Darwin, Rosenthal & Leff, Jay A. Darwin and Irwin Leff for Defendants and Appellants.

Brobeck, Phleger & Harrison, Charles E. Hanger and E. J. Elderkin for Plaintiff and Respondent.

MOLINARI, J.—This is an appeal by five defendants from a part of the judgment entered upon a jury verdict awarding

plaintiff damages based upon alleged tortious conduct of said defendants as the result of the establishment of a picket line.[1]

## Factual Background

We shall hereinafter state the pertinent facts as they relate to the particular questions and issues presented on this appeal. Preliminarily, however, we set out the following factual background.

Fibreboard is a manufacturer of roofing, shingles, paint, insulations, floor coverings and other products at a plant located in Emeryville in California. In July 1959[2] over 800 persons worked in this plant, of whom more than 70 were involved in maintenance work. Fifty of the maintenance men were members of and represented by the Union. The production workers in the plant were represented by six different unions other than the Union, and the warehousemen employees were represented by the International Longshoremen's & Warehousemen's Union, hereinafter referred to as the "ILWU." On July 31, Fibreboard discharged all of its maintenance men, including those represented by the Union, because it had decided to contract the plant's maintenance work to an independent contractor, the Fluor Maintenance Company. In protest against the discharge the Local authorized and established a picket line at Fibreboard's Emeryville plant on July 31. The said picketing was thereafter authorized and sanctioned by the International.

On August 3, Fibreboard filed its complaint for injunction in the present action and a temporary restraining order was issued by the superior court limiting the number of pickets and enjoining defendants from obstructing or interfering with ingress and egress of employees and others, and from intimidating, coercing, threatening or committing property

---

[1]Plaintiff, Fibreboard Paper Products Corporation, a corporation, will be hereinafter referred to as "Fibreboard." Defendants are: East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO, hereafter sometimes referred to as the "Local"; United Steelworkers of America, AFL-CIO, hereinafter sometimes referred to as the "International"; Lloyd Ferber, Business Agent of the Local, hereinafter referred to as "Ferber"; William F. Stumpf, Staff Representative of the International, hereinafter referred to as "Stumpf"; and Dave Arca, a member of the Local and its Recording Secretary in July and August 1959, hereinafter referred to as "Arca." The said Local and said International when referred to collectively shall be hereinafter designated as the "Union."

[2]Unless otherwise specified herein all dates refer to the year 1959.

damage or bodily harm or violence on persons attempting to enter or leave Fibreboard's plant. The restraining order was served on Ferber and Stumpf, and the pickets and other members of the Local were informed of the order and instructed to comply with it. Beginning on August 7, and thereafter during the month of August contempt proceedings alleging 26 counts of violations of the temporary restraining order were filed by Fibreboard. Contempt findings were made against the Local, and one of its members, for activities occurring on August 10th; against Arca, and another member of the Local, and the Local itself, for activities occurring on August 19th; and against Arca, Ferber, and two other individuals, and the Local itself, for activities occurring on August 21st. All other contempt counts were dismissed.

On August 24, a preliminary injunction was issued on the same terms as the temporary restraining order, and on September 4, the preliminary injunction was modified to enjoin all picketing. A supplemental complaint was thereafter filed by Fibreboard alleging that the acts complained of in its complaint for injunction continued from August 4th to September 5th, and praying for compensatory and punitive damages for its loss of business, profits and continuing expenses allegedly caused by defendants' acts. In addition to answers denying the essential allegations of the complaint and supplemental complaint, defendants filed an amended answer further answering the complaint, and alleging three affirmative defenses. The first defense alleged the existence of a collective bargaining agreement between Fibreboard and the Union and a breach thereof by Fibreboard in unlawfully discharging the maintenance employee members of the Union; the second, that Fibreboard "does not come into equity with clean hands"; and the third, that the acts complained of in the complaint and supplemental complaint were caused and induced by Fibreboard in concert with others by assaulting and otherwise molesting the duly stationed pickets and by the use of " 'strikebreakers.' " Thereafter, and prior to the commencement of the trial, and on motion of Fibreboard, the aforesaid first affirmative defense was ordered stricken by the court below.

The cause proceeded to trial before a jury. During the course of the trial, defendants moved to amend their answer to add four additional affirmative defenses, designated, respectively, as the fourth, fifth, sixth, and seventh defenses.

The court granted the motion as to the seventh defense which alleged, in essence, that if the acts complained of in the complaint and supplemental complaint occurred at all, they were provoked and induced by Fibreboard by reason of fraudulent representations made by Fibreboard to the Union. It was asserted that representations were made by Fibreboard that it intended to meet with the Union and negotiate a collective bargaining agreement to be effective on August 1, that it did not intend to so do, and that the Union relied upon such representations to its detriment without being permitted to protect its position in relation to Fibreboard and with reference to the renewal provisions under the collective bargaining agreement then in existence.[3]

The jury returned its verdict in favor of Fibreboard against all defendants for compensatory damages in the sum of $285,000, and for punitive damages against the International in the sum of $20,000 and against the Local in the sum of $4,000. The action was continued for the trial court's consideration of the question as to whether a permanent injunction ought to be granted. The court thereafter entered judgment upon the jury's verdict, and ordered in said judgment that Fibreboard was not entitled to a permanent injunction against defendants, or any of them, and that the modified preliminary injunction theretofore issued be vacated and dissolved.[4]

The instant appeal by defendants is from said judgment, excepting that portion denying a permanent injunction and vacating and dissolving the preliminary injunction. The questions raised on appeal by defendants are set out in the headings preceding the several subjects hereinafter discussed in this opinion.

### *Were the Damages Awarded Fibreboard Proximately Caused by the Tortious Conduct of Defendants?*

*Yes.* Defendants contend that although there was evidence of "incidents" on or near the picket line from which the jury could have arrived at the conclusion that some of the behavior on the picket line was tortious, there

---

[3]Defendants assert on this appeal that the refusal to grant the motion to add the sixth affirmative defense was a prejudicial abuse of discretion. We shall hereinafter separately discuss the propriety of the trial court's action in regard to this proposed amendment.

[4]Findings of fact and conclusions of law were waived as to the issues submitted to the trial court.

was no causal connection between such conduct and the damages suffered by Fibreboard. The assertion is accordingly made by defendants that in the instant case the determination of such causal connection is a question of law and not one of fact. The basis of defendants' argument is that Fibreboard's losses do not stem from the inability to "produce" goods because of the picket line, but from the inability to "move" goods through the warehousemen who were legally and properly observing the picket line. Fibreboard's response to this argument is that its damages are predicated upon the loss of sales resulting during the period the plant was closed because of the picket line, and that such losses resulted not only because the production workers "stayed out" during such period, but also because there is ample evidence in the record from which the jury could conclude either that the warehousemen would have crossed the picket line if it had been safe to do so, or, if they had not crossed the picket line because of union principles, their employment would have been terminated and the work given to others. Accordingly, Fibreboard argues that the question of causation was one of fact for the jury whose determination, under the state of the record, may not be disturbed by the appellate court because of the limitations placed upon its reviewing powers insofar as questions of fact are concerned.

Turning to the record in this case, we find substantial evidence of tortious behavior on the picket line. Within an hour after the Local established the picket line cars attempting to enter the plant were halted. Robert Baldwin, Jr., personnel director of the plant, took a picture of a group of men congregating about the entrance of the plant. He was approached by Arca and other pickets, forcibly relieved of his camera and was knocked down in the process. On August 1st, R. C. Thumann, Fibreboard's director of industrial relations, and two other managers were refused entry into the plant by Arca, necessitating police intervention to effect entry. On August 2, production workers, who were members of the Pulp, Sulphide and Paper Mill Workers Union, coming to work the "graveyard shift" did not cross the picket line and were sent home by their international representative, Bradford, after he was told by Ferber that if Bradford's members attempted to go to work "it wouldn't be a peaceful picket line."

The first regular work day after picketing began was on

Monday, August 3d. In the morning of that day, approximately 25 to 30 cars were stopped by the pickets, resulting in a long caravan of automobiles; cars were shaken up and down and then were permitted to enter the premises; salaried workers were stopped for a period of time and then were permitted to enter; and one Marcos, financial secretary of the Oil, Chemical and Atomic Workers Union, attempted to cross the picket line at the insistence of his members but decided it was unsafe when he was told by a picket that " ' [e]ventually, you will get the hell beat out of you.' " On the same day and on the day following, the international representative of the Pulp and Sulphide Workers, Carol Howes, sought permission to have his men cross the picket line, but was told that there would be violence if his men went through the line. Howes testified that he and his men experienced threats and intimidations and that they were told that if they crossed the line they should think about their families and their homes. It was further testified by Howes that if he could have taken his men safely through the line he would have done so. Lawrence Alvers, a varnish department foreman and president of Local 1101 of the Paint Maker's Union, attempted to go through the picket line on August 3, and was told that if he did go through the line he would get his head "bashed in." Alvers did not enter the plant during the period of the shutdown because, as he testified, "there was too much violence there." The Printing Specialties Union representative, Mr. Farrow, told Stumpf that his men wanted to return to work, but was told by Stumpf that they would be "on their own" if they went through the line.

Bradford also testified that on August 10th, he was told by Stumpf that if his men returned to work their front porches might be blown off or their cars overturned; that when he started to walk across the street to confer with Thumann he was accosted by Lincoln Beck of the Local and pushed 15 or 20 feet back up the street; and that Beck later drove his automobile down the street toward him and that he had to jump behind a car to avoid being struck.

During the days of August 19, 20 and 21, the following occurred: General Foreman Jochum's car was stopped; he was struck and the windshield of his car was smashed and broken. Design Foreman Paul Stearns' car was similarly handled; he was also struck while sitting in the car and the rear window of his car was broken. Stumpf threw an object

at a car attempting to enter the plant and Ferber hit the window of a car with his fist. Two attorneys representing Fibreboard were battered when they tried to enter the plant on foot, and Arca and Beck were arrested. Frank Remley, one of the millwrights hired to do the maintenance work by Fluor Maintenance Company, was beaten and kicked by six or eight men and sustained injuries, including broken ribs, nose and tooth, which caused him to be hospitalized and off work for six or seven weeks. Arca then drove his truck into a car filled with millwrights, whereupon a group of men immediately overturned the car and injured millwright Luther Schockey. None of the other production workers made any attempt to return to work until August 31. On that day the Pulp and Sulphide Workers returned to work under police escort. Their union representative, Bradford, testified that at that time Stumpf and Ferber told him "that some place or somewhere I was going into a dark place or into a dark alley, and if it was the last thing they ever did, they were going to get me."

William Burke, business agent for the ILWU, was called as a witness for defendants. He testified, on direct examination, that it was the policy of the ILWU not to cross picket lines and that a few days before the picketing took place, he advised Thumann that the warehousemen would not cross the picket line because of this policy. He also testified that members of his union did not cross the picket line from July 31 through September 4, except for the plant protection personnel who are permitted to cross picket lines. Burke testified, further, that he was in the general picketed area almost daily between 7 and 8 a.m. because some of his men would come down to find out if the picket lines were still up or if the strike was still in progress. He also stated that on other occasions when he was in the general area he "would stop by to see how things were going." On cross-examination, Burke identified a contract between his union and Distributors' Association, a group of employers, of whom Fibreboard was one. It appears that prior to its being identified, counsel for defendants interposed an objection to its admission on the ground that it was not binding on defendants.[5] The trial

---

[5] "MR. DARWIN: I don't know for what purpose it is being offered. It isn't binding as to these defendants. I would object to it on that ground, but that is a basic objection. MR. HANGER: We are offering

court did not then rule on the objection but suggested that the contract be identified. Burke was then asked certain foundational questions as to whether the subject document was a true and correct copy of the contract between the ILWU and Fibreboard in existence during July, August and September of 1959. Upon the witness' affirmative answer, the offer was renewed. No objection was interposed by defendants. The contract was thereupon admitted in evidence.[6] Plaintiff's counsel then read a portion of section 14 of said contract into the record, a part of which consisted of the following language: " 'Any action of the employees leaving jobs for their own protection in cases of a legally declared strike by some other union directly working on the job, if such strike is sanctioned and approved by the labor body or council having jurisdiction, shall not constitute a violation of this Agreement.' " Upon request of the witness Burke, plaintiff's counsel then read the following paragraph of the contract into the record: " 'The Union agrees that it will not support strikes or picket lines by unions not parties to this Agreement unless such union's right to organize peacefully has been interfered with by the Employer, or unless it has been denied the means of peaceful settlement of its dispute.' "

Burke testified further, on cross-examination, that during the month of August, Thumann asked the warehousemen to return to work and to cross the picket line, to which request the ILWU replied by a letter signed by him and two other business agents. The letter was shown to Burke and identified by him.[7] The witness testified that the letter quoted, among others, the two paragraphs of the contract previously read into the record by plaintiff's counsel, and in this respect stated: "I stated we would have the right to respect a picket line without breach of contract, and quoted the paragraph above it ... which refers generally to leaving the job for self-protection." Burke was then queried on cross-examination as to what the words " 'for their own protection' " meant to him. He replied: "Well, it could be protection of body, pro-

it solely for the purpose of showing the contract that they had with them. THE COURT: Well, have him identify it."

[6]"MR. HANGER: All right, then, we will offer it at this time. THE COURT: Yes. It will be admitted into evidence, then, as Plaintiff's next in order."

[7]The letter was not read or offered in evidence.

tection of conscience, protection of feelings, protection of their social standing in the community."[8] Burke testified, further, that the ILWU will cross a picket line to perform work within its jurisdiction if it is "cleared" by the striking union.

The record discloses, relative to the aforementioned telephone conversation between Burke and Thumann, that Thumann testified that Burke did not tell him the warehousemen would not cross the picket line, but that Burke stated "he didn't know what his boys would do." On rebuttal, Thumann testified that if the warehousemen had refused to cross the picket line solely on the union principle that they never crossed picket lines, he would have required them to return to work, and if they failed to so do he would have employed others. He stated, further, that there were other workers available in the Bay Area to do this type of work.

The function and duties of the warehousemen, as described by witnesses presented by both sides, consisted of the unloading of raw materials, used in the various manufacturing processes, when delivered by trucks and trains; to store these materials until needed for production; to move such materials and finished products within the plant; and to ship out and load on trucks and trains the finished products for customer needs.

The only witness produced by Fibreboard to establish the extent of its damages was its assistant comptroller, Ben H. Rich, a certified public accountant. Rich testified as to the type of products manufactured in the Emeryville plant, and that certain of the products produced by Fibreboard were only manufactured at the Emeryville plant. Rich also testified that there was no production at the Emeryville plant during the month of August and the first week of September, except for some production in the floor covering plant. It was his testimony that he computed the profits lost by reason of the shutdown of the Emeryville plant from July 31 until September 7 upon the basis of estimate of sales, and that this

[8]The pertinent question and answer is as follows: "Q. Well, Mr. Burke, what do the words 'for their own protection' mean to you? A. What does it mean to me? Q. Yes, what does that language mean to you? A. Well, it could be protection of body, protection of conscience, protection of feelings, protection of their social standing in the community. Q. You say, 'It could be protection of body'; is that correct? A. Among other things; yes."

loss amounted to $554,000. The computation of this loss was arrived at by Rich as follows: The estimated sales from the five products produced at the Emeryville plant[9] had there not been a shutdown, based upon a five-year seasonal sales pattern, should have been $3,548,000; from this sum was deducted the sum of $3,094,000 manufacturing cost estimate based upon the most recent manufacturing experience, i.e., the month before the shutdown, leaving an estimated profit of $454,000. To this last figure was added a loss of $100,000 resulting from what Rich referred to as "actual results," making the total loss of profits the aforesaid sum of $554,000. The "actual results" were arrived at by him as follows: The actual sales of said five products were computed for the period of August and September 1959 and amounted to $2,539,000, from which was deducted the actual production cost for said period, amounting to $2,639,000, thus leaving a loss of $100,000. Rich testified that he used the August and September period because these were the months affected by the shutdown; that the shutdown ran into September and the books are closed on a monthly basis; and that in September there was a considerable "makeup" of sales which were included so as to give them full credit in the computation. The seasonal sales pattern method was described by Rich as a method by which the percentage of sales which would fall in August and September were determined upon the basis of experience for the five years, 1956 through 1960, omitting 1959. Rich described several other methods of estimating loss,[10] whereby the estimated loss varied from $454,000 to $595,000, but stated that the method by which the $554,000 loss was computed was the more accurate because it utilized the broadest base, the five-year base.

On cross-examination, Rich testified: That when he referred

[9]Except for roofing, shingles and paint only sales from products produced exclusively at Emeryville were used in arriving at total estimated sales. With respect to roofing and shingles actual sales of the Portland, Oregon, and Wilmington, California, plants were included in order to reflect any increased sales in those plants by reason of the shift in business from Emeryville to these plants. With respect to paint a closed plant at Southgate, California, was reactivated and made some sales during the period of the shutdown, and these sales were included in the paint sales.

[10]Each of the methods used was predicated upon "lost sales" during the shutdown period, but upon comparative shorter bases of prior experience. The method of estimating costs was the same under each method, i.e., the most current cost experience in July 1959.

to "no sales" being made during the period of shutdown he meant that no finished goods moved out of the plant pursuant to an order which had to be filled; that as of July 31 there was an inventory in all of Fibreboard's plants; that during the month of August no goods were shipped from the Emeryville plant; that "[i]f goods could have been shipped, they would have resulted in sales ... if we have no shipments, we have no sales"; and that there was no production in the Emeryville plant in the month of August.

Defendants do not attack, on this appeal, the method utilized by Fibreboard in computing loss of profits; nor do they claim that the damages thus established were not in fact sustained. They do contend, however, that there is no causal connection between these damages and whatever tortious conduct may be attributed to their activities on the picket line. The thrust of their argument is that Fibreboard's damages are predicated solely on lost sales, and that even if goods had been produced during the time the Emeryville plant was picketed, sales would not have been realized from such production because the warehousemen were not working out of respect for the picket line which they were legally entitled to recognize under the terms of their contract with Fibreboard. In other words, say defendants, the sales lost were occasioned by the failure of the warehousemen to move the finished goods and not because of lost production. It should be noted here that while goods were not produced during the shutdown period and therefore finished goods were not added to inventory, there is nothing in the record to show that the inventory on hand on July 31[11] was not adequate to meet orders for the months of August and September, the two months during which Fibreboard claims loss of profits. Under the evidence adduced, the nonproduction occasioned by the shutdown at the Emeryville plant could only be related to the months of August and September. Fibreboard's damages are predicated upon a loss computed on the basis of the net profit upon estimated sales from all plants, had there not been a shutdown, as compared to the actual net loss realized from sales made from such plants during the months of August and September. There was no evidence presented by Fibreboard as to the nature and extent of the nonproduction during the months of August and September, nor of the effect of such nonproduction upon future sales. It

[11]The extent and nature of this inventory was not established.

is apparent, under the state of the record, that Fibreboard's damages are predicated upon the inability to consummate sales in August and September. Such sales contemplate the existence of such goods in inventory, or the production of said goods to make up such inventory, plus the shipment of such goods to the customer. We are satisfied that there is substantial evidence establishing that defendants' tortious conduct prevented the production workers from producing goods in the Emeryville plant during the months in question. However, in the light of Fibreboard's basis for the computation of its claimed damages, we must also consider whether any tortious conduct on the part of defendants prevented the *shipment* of goods from existing inventory or from such inventory as replenished by production. As disclosed by the record, the movement of raw materials for production within the plant, the movement of finished goods within the plant and the shipment of such goods to customers were the function and responsibility of the warehousemen. Our inquiry, therefore, is now directed to whether any tortious conduct on the part of defendants prevented or impeded the warehousemen from performing that duty.

In reviewing the sufficiency of the evidence, we deem it expedient to call to mind certain well-established principles defining the scope of our review. These are: "[A]ll conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible"; (2)"when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury"; and (3) when two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the jury. (*Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Florez* v. *Groom Development Co.*, 53 Cal.2d 347, 354 [1 Cal.Rptr. 840, 348 P.2d 200]; 3 Witkin, Cal. Procedure, § 84, pp. 2245-2246.) Consonant with these principles "we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom," (*Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, 370 [210

P.2d 757]) because these matters rest within the province of the trier of fact. (Code Civ. Proc., §§ 2061, 1879, 1847; *English* v. *Drumwright,* 195 Cal.App.2d 809, 813 [16 Cal.Rptr. 265]; *People* v. *Hecker,* 179 Cal.App.2d 823, 827 [4 Cal.Rptr. 334].) ▮ Our cognizance of the function of the trier of fact requires that we recognize the rule that upon the trial of a case the jury is to find not only the facts but the inferences from them, if any may properly be drawn. (*People* v. *Berti,* 178 Cal.App.2d 872, 876 [3 Cal.Rptr. 51]; *Rovegno* v. *San Jose K. of C. Hall Assn.,* 108 Cal.App. 591, 596 [291 P. 848].) An inference is defined in section 1958 of the Code of Civil Procedure as follows: "An inference is a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect." An inference arises when it is founded: "(1) On a fact legally proved; and (2) On such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature." (Code Civ. Proc., § 1960.) ▮ An inference is a recognized class of indirect evidence. (Code Civ. Proc., § 1957.) ▮ Accordingly, if a finding is based upon a reasonable inference it will not be set aside by an appellate court unless it appears that the inference was wholly irreconcilable with the evidence. (*General Petroleum Corp.* v. *City of Los Angeles,* 42 Cal.App.2d 591, 595 [109 P.2d 754]; *Thayer* v. *Pacific Elec. Ry. Co.,* 55 Cal.2d 430, 438 [11 Cal.Rptr. 560, 360 P.2d 56]; *Larson* v. *Solbakken,* 221 Cal. App.2d 410, 416 [34 Cal.Rptr. 450]; *People* v. *Santo,* 43 Cal. 2d 319, 326-327 [273 P.2d 249]; see 18 Cal.Jur.2d, Evidence, § 62, p. 483.)

▮ We believe that the jury in the instant case had the right to reasonably infer that the warehousemen remained away from work because of the threats, intimidation and violence at the picket line. There is direct evidence that the warehousemen did not cross the picket line from July 31 to September 4. While there is no direct evidence of any threats, intimidation or violence directed to or perpetrated upon the warehousemen, there is ample direct evidence in the record of violence upon members of other unions and personnel employed by Fibreboard. The nature, frequence and extent of this tortious conduct was such that it was reasonable for the jury to infer that the warehousemen were aware of it. In the

face of the evidence adduced, the jury, as the trier of fact, was entitled to reject Burke's testimony that he saw no violence. We do not think it necessary that there be evidence that the warehousemen physically attempted to cross the picket line and thus risk violence. The jury was entitled to infer under the circumstances, we believe, that because violence was being perpetrated on others who attempted to cross the picket line, the warehousemen were under the apprehension that such tortious conduct would likewise be inflicted upon them if they made the attempt.

Fibreboard contends that the jury was also entitled to consider the union contract between ILWU and Fibreboard, the aforesaid letter from ILWU to Thumann, and Burke's testimony with respect thereto as evidence that the warehousemen remained away from work for their own protection.

Addressing ourselves, first, to the contract, we find that it was received in evidence without objection. Although, when first offered, it was objected to on the ground that it was not binding on defendants, the trial court did not rule on the objection, but suggested instead, that a foundation be laid with respect to its identification. Counsel for defendants did not request a ruling nor did he press his objection when the offer was subsequently renewed. Under the circumstances the objection was abandoned and waived. (See *Goodale* v. *Thorn,* 199 Cal. 307, 315 [249 P. 11]; *Campbell* v. *Genshlea,* 180 Cal. 213, 220 [180 P. 336]; *People* v. *Staver,* 115 Cal. App.2d 711, 724 [252 P.2d 700]; Witkin, Cal. Evidence, § 720, pp. 749-750.) Of paramount significance, moreover, is defendants' failure, on this appeal, to assert in their briefs or in oral argument the assignment that the trial court erred in admitting the subject contract in evidence.[12] To the contrary, defendants in their briefs rely upon the contract and contend that the jury was entitled to infer that pursuant to its provisions defendants remained away from work because of union principle. It is apparent, therefore, that if the jury was entitled to draw the inference urged by defendants it was likewise entitled to draw the inference that by reason of the contractual provisions defendants remained away from their work because of "their own protection." The jury, as the

---

[12]Assignments of error not noticed or argued in appellant's brief are deemed waived. (*Title G. & T. Co.* v. *Fraternal Finance Co.,* 220 Cal. 362, 363 [30 P.2d 515]; *People* v. *Scott,* 24 Cal.2d 774, 783 [151 P.2d 517]; *Blackman* v. *Kristovich,* 216 Cal.App.2d 792, 795 [31 Cal.Rptr. 413].)

trier of fact, was not compelled to accept Burke's explanation that the warehousemen remained away solely because of union principle.

Directing our attention to Burke's testimony, relative to the contents of the letter from the ILWU to Thumann, we note that it too was received into evidence without objection. Defendants, in their answer to Fibreboard's petition for a rehearing argue that this testimony does not contain prior inconsistent statements, and that, therefore, it is not of impeaching character. This position is the same as that urged by defendants in their briefs on appeal, the gist of their argument being that Burke's uncontroverted testimony showed that union principle, and not fear of violence, led the warehousemen to respect the picket line. It appears, however, that a contrary position is taken by defendants in their supplementary brief after the argument on rehearing. The position there taken is that the effect of the subject evidence was merely to discredit Burke as a witness, and, presuming that the jury disbelieved him, it was justified in disbelieving his testimony that the warehousemen did not cross the picket line because of union principle. Accordingly, they assert it was not competent for any other purpose, and, in particular not competent as positive evidence that the warehousemen did not cross the picket line because of fear or threats of bodily harm or violence. The principle relied upon by defendants is that declared by the rule that the prior inconsistent statement of a witness, not a party to the action, is admissible only for purposes of impeachment and is not substantive or affirmative evidence sufficient to sustain a finding. (*Albert v. McKay & Co.*, 174 Cal. 451, 456 [163 P. 666]; *People v. Orcalles*, 32 Cal.2d 562, 572 [197 P.2d 26]; *Wilson v. Foley*, 149 Cal.App.2d 726, 731 [309 P.2d 97]; Witkin, Cal. Evidence, § 662, pp. 701-702.)

In order that a witness' present testimony be subject to impeachment, the prior statement must be clearly inconsistent; "But *inconsistency in effect* rather than contradiction in express terms is the test." (Witkin, Cal. Evidence, § 664, p. 702; see McCormick, Evidence, § 34, pp. 63, 64; 3 Wigmore, Evidence, § 1040, p. 725; and see *Froeming v. Stockton Electric R.R. Co.*, 171 Cal. 401, 408 [153 P. 712, Ann. Cas. 1918B 408].) Applying this test to the present case it appears that the general purport of the subject testimony was to contradict Burke's testimony by show-

ing that while he testified that the warehousemen remained away from work solely on union principle, the subject letter indicated that they did not cross the picket line not only because of such principle but also because of fear of violence. We are not, however, concerned in the instant case with the rule under discussion because the testimony in question was admitted without objection and without limitation. Whether we consider such testimony as consistent or inconsistent the effect is the same. In either event the testimony was hearsay to which no objection was interposed. Accordingly, we need not consider whether it was admissible under an exception to the hearsay rule.[13] Material and relevant evidence which is technically inadmissible under an exclusionary rule, if offered and received without objection, may be considered in support of a judgment. (*Crocker-Anglo Nat. Bank* v. *American Trust Co.,* 170 Cal.App.2d 289, 299 [338 P.2d 617]; *Powers* v. *Board of Public Works,* 216 Cal. 546, 552 [15 P.2d 156]; see Witkin, Cal. Evidence, § 723, p. 751.) If the testimony be deemed consistent it would have been subject to exclusion upon objection, but in the absence of objection it constituted substantive and affirmative evidence. (See *Froeming* v. *Stockton Electric R.R. Co., supra,* p. 408; *People* v. *Collum,* 122 Cal. 186, 188 [54 P. 589]; *Estate of O'Connor,* 118 Cal. 69, 70 [50 P. 4]; *People* v. *Burns,* 16 Cal.App. 416, 423 [118 P. 454].) On the other hand, if treated as an inconsistent statement the testimony would have properly been admitted as an exception to the hearsay rule solely for the purposes of impeachment. In the latter instance, it was incumbent upon defendants to seek to restrict the use of such testimony for that specific purpose. Their failure to do so left Burke's testimony with respect to the letter in evidence for all purposes. (*Wicktor* v. *County of Los Angeles,* 177 Cal.App.2d 390, 405 [2 Cal.Rptr. 352]; *Hatfield* v. *Levy Brothers,* 18 Cal.2d 798, 810 [117 P.2d 841]; *People* v. *Hawkins,* 177 Cal.App.2d 714, 719 [2 Cal. Rptr. 524]; Witkin, Cal. Evidence, § 115, p. 138; § 709, p. 741.) Under the circumstances, therefore, the jury was entitled to weigh, consider and reconcile this testimony with the other evidence in the case, and to draw the inference that

---

[13]Fibreboard argues that the testimony was admissible under the "verbal acts" exception to the hearsay rule. (See Witkin, Cal. Evidence, § 216, p. 242; 6 Wigmore, Evidence, § 1772 et seq., p. 190; McCormick, Evidence, § 274, pp. 585, 586.)

the warehousemen did not cross the picket line because of fear of violence.

As concerns Burke's explanation of the meaning of the words "for their own protection," his testimony in that regard likewise went into the record without objection. No contention is made on this appeal that the admission of such evidence does violence to the parol evidence rule. Accordingly, the evidence may be considered by us in ascertaining whether inferences can be drawn from the agreement between the ILWU and Fibreboard as to the meaning of the provisions alluded to and the contracting parties' intention. (*Pao Ch'en Lee* v. *Gregoriou,* 50 Cal.2d 502, 505-506 [326 P.2d 135] ; *Santa Clara Properties Co.* v. *R.L.C., Inc.,* 217 Cal. App.2d 840, 849-850 [32 Cal.Rptr. 333].) ▮ Burke testified that the words in question "could be protection of body, protection of conscience, protection of feelings, protection of their social standing in the community." It was, therefore, susceptible of the inference that in view of the provisions of the contract the warehousemen did not cross the picket line because of fear of violence.

Adverting to Thumann's rebuttal testimony that if the warehousemen had based their refusal to cross the picket line solely upon union principle, he would have required them to return to work, and if they failed to do so, he would have employed others, we are of the opinion that this testimony was speculative, conjectural and conclusionary. An objection on that ground was interposed by defendants but was overruled. The objection should have been sustained. However, no assignment of error is made by defendants on this appeal. To the contrary, it is urged by defendants that this testimony was directly contrary to Thumann's prior testimony and that it has no probative value. Fibreboard concedes, in its petition for rehearing that this testimony does not establish threats or violence, but that its purpose was to show that if violence had ceased, and the production unions had returned while the ILWU had based its return to work solely on union principle, the plant would have continued to operate. Under the circumstances, the probative effect of this testimony, if any, was for the jury's determination.

Turning to the question of damages in the present case, our inquiry is directed to whether the damages proved by Fibreboard through the testimony of Rich were proximately caused by any tortious acts of defendants. The

gravamen of Fibreboard's complaint, insofar as damages are concerned, is that it "lost business and profits" and "incurred continuing costs in the maintenance of its said plant and of its said business" during said period by reason of its being prevented by the conduct of defendants "from operating its plant and producing its usual commodities. . . ."[14] Rich testified that the continuing costs, which he itemized, amounted to $185,000 and that this sum was reflected in the computation of lost profit amounting to $554,000. No proof was adduced as to the nature and extent of the commodities which were not produced during the period in question. The damages claimed by Fibreboard were predicated solely upon a loss in sales during the shutdown period based upon goods they were unable to "move out" or "ship" during said period. While there is evidence that goods were not produced during said period, there is also evidence that there was an inventory of goods on hand at the commencement of the picketing. The extent of this inventory was not established. It may well be that there was ample inventory to satisfy orders during the shutdown period had Fibreboard been able to ship such goods. There is no evidence, moreover, whether goods which might have been produced during said period would have been moved out or shipped during said period, and, if so, to what extent.

The measure of damages in this state for the commission of a tort, as provided by statute, is that amount which will compensate the plaintiff for all detriment sustained by him as the proximate result of the defendant's wrong, regardless of whether or not such detriment could have been anticipated by the defendant. (Civ. Code, § 3333.) It is well established in California, moreover, that such damages may include loss of anticipated profits where an established business has been injured. (*Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal.2d 193, 199 [143 P.2d 12]; *Hoag* v. *Jenan,* 86 Cal.App.2d 556, 563 [195 P.2d 451]; *Guttinger* v. *Calaveras Cement Co.,* 105 Cal.App.2d 382, 387 [233 P.2d 914]; *Yates* v. *Kuhl,* 130 Cal.App.2d 536, 542 [279 P.2d 563].) The basis of this principle is that where the operation of an established business is prevented or interrupted by a tort, damages for loss of prospective profits, that otherwise might have been made from its operation, are

---

[14] The record does not disclose that any pretrial conference order was made.

ordinarily recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the working experience of the business, from the past volume of business, and other provable data relevant to the probable future sales. (*Grupe* v. *Glick,* 26 Cal.2d 680, 692-693 [160 P.2d 832]; *Hoag* v. *Jenan, supra,* at p. 563; *Gainer* v. *Storck,* 169 Cal.App.2d 681, 687 [338 P.2d 195]; *Edwards* v. *Container Kraft Carton etc. Co.,* 161 Cal.App.2d 752, 759-761 [327 P.2d 662].) ▮▮▮ Concomitant with this principle is the rule that the award for damages for loss of profits depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no tort. (*Natural Soda Products Co.* v. *City of Los Angeles, supra,* at p. 199; *Guttinger* v. *Calaveras Cement Co., supra,* at p. 387; *Edwards* v. *Container Kraft Carton etc. Co., supra,* at pp. 759-761.) If no such basis exists, it may be necessary to deny such recovery, but if, however, there has been an operating experience sufficient to permit a reasonable estimate of probable income and expense, damages for loss of profits are awarded. (*Natural Soda Products Co.* v. *City of Los Angeles,* at p. 199; *Edwards* v. *Container Kraft Carton etc. Co., supra,* at pp. 759-761.) While the courts have often noted the difficulty of proving the amount of loss of profit, they have also recognized that a defendant cannot complain if the probable profits are of necessity estimated, the rationale being that it was the defendant himself who prevented the plaintiff from realizing profits. (See *Natural Soda Products Co.* v. *City of Los Angeles, supra,* at p. 199.) ▮▮▮ Accordingly, it is clear from the cases that the general principle inherent in the recovery of damages for loss of prospective profits is that the evidence must make *reasonably certain* their nature, occurrence and extent. In sum, such evidence must be of reasonable reliability. (See *Grupe* v. *Glick, supra,* at p. 693.)

▮▮▮ Turning to the case at bench, there is ample evidence of operating experience sufficient to permit a reasonable estimate of probable income and expense to furnish a basis for estimating what the probable earnings would have been had there been no tort. As we have hereinabove pointed out, the defendants do not attack the method utilized by Fibreboard in computing loss of profits, nor do they claim that the loss of profits established by Fibreboard was not in fact sustained. Their contention is that Fibreboard has not

met its burden of proof because the damages are divisible. The basis of this assertion is that under the state of the record Fibreboard's loss of profits resulted in part from defendants' tortious conduct and in part from the failure of the warehousemen to cross the picket line because of union principle. This contention assumes that the jury was compelled to find that the warehousemen did not cross the picket line because of union principle. As hereinbefore discussed the jury was entitled to find that the warehousemen remained away from work because of fear of violence or for union principle, or for both reasons. Having found in favor of Fibreboard upon inferences it was properly entitled to draw, we may assume that the jury found that the warehousemen stayed away solely because of the violence at the picket line. Assuming *arguendo* that implicit in the jury's verdict is a finding that the warehousemen stayed away from work both because of fear of violence and union principle, we do not believe it was incumbent upon Fibreboard to show what portion of its damages was caused by the tortious conduct and what part was attributable to the nontortious. We doubt that such a showing could be made. ■■■ The applicable rule is that one who contributes to damage cannot escape liability because the proportionate contribution may not be accurately measured. (*City of Oakland* v. *Pacific Gas & Elec. Co.*, 47 Cal.App.2d 444, 450 [118 P.2d 328]; *Reclamation Dist. No. 833* v. *American Farms Co.*, 209 Cal. 74, 80 [285 P. 688]; *Cummings* v. *Kendall*, 41 Cal.App.2d 549, 558-559 [107 P.2d 282]; *DeCorsey* v. *Purex Corp.*, 92 Cal.App.2d 669, 676 [207 P.2d 616]; see *Summers* v. *Tice*, 33 Cal.2d 80, 85 [199 P.2d 1, 5 A.L.R.2d 91].) ■■■ It is not necessary that the negligence of the defendant be the sole proximate cause of the damage, but there may be other factors which contribute to the extent of the damage. It is sufficient that such negligence be one of the contributing causes thereof. (*Finnegan* v. *Royal Realty Co.*, 35 Cal.2d 409, 419 [218 P.2d 17]; *DeCorsey* v. *Purex Corporation, supra,* at p. 676.) ■■■ The rule is stated thusly in the Restatement: "If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be held by the jury to be a substantial factor in bringing it about." (Rest., Torts, § 432, cited with approval in *Summers* v. *Tice, supra.*) ■■■ While it is incumbent

upon the party alleging injury to prove the amount of damages, if the damages proven could be reduced proportionately, that burden rests upon the defendant. (*City of Oakland* v. *Pacific Gas & Elec. Co., supra,* at p. 450; *Vitagraph, Inc.* v. *Liberty Theatres Co.,* 197 Cal. 694, 699-700 [242 P. 709]; *Andersen* v. *La Rinconada Country Club,* 4 Cal.App.2d 197, 201 [40 P.2d 571].) ▮▮▮ Prosser states the applicable principle as follows: ''[W]here it is clear that a defendant has been at fault and that he has caused some part of the plaintiff's damages, the burden of proof should rest on him to show the extent of his contribution, and that if he cannot sustain it he should be liable for the entire loss.'' (*Proximate Cause in California,* 38 Cal.L.Rev., pp. 369, 388-389.) In more emphatic language, we find the principle stated in *Navigazione Libera T. S. A.* v. *Newtown Creek T. Co.,* 98 F.2d 694, cited in *Cummings* as follows: '' '[W]hen one of the two contributing factors is not the result of actionable fault ... the single tortfeasor cannot be allowed to escape through the meshes of a logical net. He is a wrongdoer; let him unravel the casuistries resulting from his wrong.' '' (P. 559.) In the light of the applicable principles Fibreboard has sustained its burden, but the record does not show that defendants have sustained theirs.

The cases cited by defendants with respect to the divisibility of damages are distinguishable. Each involves a factual situation where separate tortfeasors acted independently of each other and without concert or unity of design. In *Connor* v. *Grosso,* 41 Cal.2d 229 [259 P.2d 435], and *Slater* v. *Pacific American Oil Co.,* 212 Cal. 648 [300 P. 31], it was held that each defendant was liable only for such proportion of the total damage as was caused by his own acts and that the trier of fact was at liberty to estimate the proportion as best it could. The other case relied upon, *Dauenhauer* v. *Sullivan,* 215 Cal.App.2d 231 [30 Cal.Rptr. 71], supports the rule of indivisibility rather than that urged by defendants. There the appellate court, relying upon *Finnegan* v. *Royal Realty Co., supra,* recognized the principle that even though persons are not acting in concert, if the result produced by their acts is indivisible, each person is held liable for the whole. The rationale of the *Dauenhauer* case is that the distinction is one between injuries which are capable of being divided and those which are not, the law being loath to permit an innocent plaintiff to suffer as against a wrong-

doing defendant where no logical basis for apportionment exists.

*Did the Trial Court Commit Prejudicial Error in Excluding From Evidence Documents Filed and Statements Made by Fibreboard in its Appeal to the California Unemployment Insurance Appeals Board?*

 *No.* Defendants claim that the trial court committed prejudicial error in refusing to admit in evidence a certified copy of certain documents and statements in proceedings before the California Unemployment Insurance Appeals Board. The documents consist of forms filed by Fibreboard in an appeal to said Appeals Board and the transcript of portions of the oral argument of Fibreboard's counsel before said Board. These appeals were from decisions of a Referee awarding unemployment benefits to employees of Fibreboard who were unemployed during the strike. The record does not disclose the nature of the occupation of these employees. However, the briefs of the respective parties concede that the subject unemployment compensation hearings were concerned only with the production workers. The proffered exhibit discloses that it was Fibreboard's position at the unemployment compensation hearings that the production workers stayed away from work voluntarily because of their respect for the picket line upon union principles, and not because of any violence or threats.[15] Defendants sought to introduce Exhibit ''Q'' on the basis that it constitutes evidence of prior admissions inconsistent with plaintiff's allegations and proof on the main issue of the instant case. It should be noted here that Exhibit ''Q'' consists of three written appeal forms and two transcripts of oral argument before the Appeals Board.[16]

 The principle is well established in this state that a declaration of a litigant contrary to his position in the lawsuit is admissible under an exception to the hearsay rule as an admission. Such a declaration is not only admissible for purpose of impeachment, but it may also be used to prove the truth of the assertion, i.e., it constitutes affirmative

---

[15]Section 1262 of the Unemployment Insurance Code provides: ''An individual is not eligible for unemployment compensation benefits, and no such benefits shall be payable to him, if he left his work because of a trade dispute. . . .''

[16]It was stipulated in the trial court in the instant case that the statements and documents in Exhibit ''Q'' were made by Fibreboard's attorneys as its agents within the scope of their authority.

or substantive evidence which the jury or court may believe as against other evidence, including the party's own contrary testimony on the stand. (*Bonebrake* v. *McCormick,* 35 Cal.2d 16, 18-19 [215 P.2d 728]; *People* v. *Southack,* 39 Cal.2d 578, 585 [248 P.2d 12].) Although defendants assert that all of the statements contained in Exhibit "Q" should have been admitted in their entirety as evidentiary admissions, the thrust of their argument, as disclosed by the briefs, is directed to the contention that the three appeal forms constitute admissions made in a pleading in a prior civil proceeding. It is, of course, also a well-established principle in California that a pleading in a prior civil proceeding may be offered as evidence or for the purpose of impeachment in a subsequent proceeding. (*Meyer* v. *State Board of Equalization,* 42 Cal.2d 376, 385 [267 P.2d 257]; *Cahill Bros., Inc.* v. *Clementina Co.,* 208 Cal.App.2d 367, 383 [25 Cal.Rptr. 301]; *Dolinar* v. *Pedone,* 63 Cal.App.2d 169 [146 P.2d 237]; *Nungaray* v. *Pleasant Valley etc. Assn.,* 142 Cal.App.2d 653, 667 [300 P.2d 285].) The rationale underlying this principle is that the allegations of fact in a pleading are presumed to be those of the party, and are therefore accepted as admissions, subject to the right of the party to controvert them by showing that they were not authorized by him or were made inadvertently or under a mistake of fact. (*Dolinar* v. *Pedone, supra; Nungaray* v. *Pleasant Valley etc. Assn., supra,* at p. 667; Witkin, Cal. Evidence, § 224, pp. 251, 252.) It is convenient to mention here that the same principle has also been applied to stipulations and other statements by attorneys within the scope of their authority. (*Nungaray* v. *Pleasant Valley etc. Assn., supra,* at p. 667 (stipulation of facts in prior trial); *Gonzales* v. *Pacific Greyhound Lines,* 34 Cal.2d 749, 754 [214 P.2d 809] (stipulation as to liability in prior trial); *People* v. *Leyva,* 187 Cal.App.2d 249, 254 [9 Cal.Rptr. 469] (stipulation as to prior conviction); *Bell* v. *Staacke,* 159 Cal. 193, 196-197 [115 P. 221] (letter written by attorney prior to trial); *Scafidi* v. *Western Loan & Bldg. Co.,* 72 Cal.App.2d 550, 561 [165 P.2d 260] (admissions made in arguing a motion); see Witkin, Cal. Evidence, § 227, p. 255.) Parallel situations are those in which express concessions and assertions in a brief and in oral argument on appeal have been treated as an admission of a legal fact or point, controlling in the disposition of the case. (See *Harmon* v. *Keough,* 41 Cal.App. 773, 775 [183 P. 201]; *Kashow* v. *Plant,* 97

Cal.App. 696, 697-698 [276 P. 117]; *Morris* v. *Board of Eduction*, 119 Cal.App. 750, 752 [7 P.2d 364, 8 P.2d 502]; *Hospelhorn* v. *Newhoff*, 43 Cal.App.2d 678, 680 [111 P.2d 688]; *Kohn* v. *Kohn*, 95 Cal.App.2d 708, 716, 717-719 [214 P.2d 71]; *Browne* v. *Superior Court*, 16 Cal.2d 593, 599 [107 P.2d 1, 131 A.L.R. 276]; *Estate of Stevens*, 27 Cal.2d 108, 115 [162 P.2d 918].)[17]

Defendants lay considerable stress upon the assertion that the statements made by Fibreboard in its said appeal forms constitute admissions made in a prior pleading. Pleadings are generally associated with the trial of a cause and consist of the formal allegations of the parties of their respective claims and defenses for the judgment of the court. (See Code Civ. Proc., §§ 420, 422.) The office of pleadings is to outline the issues so that the parties may know what is involved in the litigation. (*Horton* v. *Horton*, 115 Cal.App.2d 360, 367 [252 P.2d 397]; *Brunson* v. *Babb*, 145 Cal.App.2d 214, 227 [302 P.2d 647].) Accordingly, it has been held that in civil actions the "pleadings" are those enumerated in section 422 of the Code of Civil Procedure and therefore do not include a notice of motion. (*Sievers* v. *Pacific Gas & Elec. Co.*, 57 Cal. App.2d 455, 456 [134 P.2d 850].) In the instant case, we are not concerned with the pleadings referred to in the Code of Civil Procedure, but with the "form of appeal" provided for in title 22, section 6002, of the California Administrative Code, applicable to appeals to the Unemployment Insurance Appeals Board.[18]

No California case has been cited to us, nor has any been found by us, to the effect that a notice of appeal is a pleading. ▆▆ It should be noted, however, in the instant case, that an appeal to the appeals board is something more than a

---

[17]It should be noted that an admission made in the *same* case may constitute a judicial admission, i.e., a conclusive concession of the truth of a matter which has the effect of removing it from the issues. (See Witkin, Cal. Evidence, § 224, p. 251; § 227, pp. 255-256.)

[18]Section 6002 of title 22 of the California Administrative Code provides in pertinent part that: "(a) An appeal to the appeals board need not be formal, but it shall set forth the grounds or reasons for the appeal."

Unemployment Insurance Code section 1952 provides in pertinent part as follows: "The Appeals Board and its representatives and referees are not bound by common law or statutory rules of evidence or by technical or formal rules of procedure but may conduct the hearings and appeals in such manner as to ascertain the substantial rights of the parties."

notice of appeal in the usual appeal from a judgment of a superior court which need only state that the appellant appeals from a specified judgment or a particular part thereof. (Cal. Rules of Court, rule 1(a).) It is designated as an "appeal document," which "shall set forth the grounds or reasons for the appeal." (Cal. Admin. Code, tit. 22, §§ 6001, 6002.) It has been held in other jurisdictions, where the assignments of error are designated in the document initiating the appeal, that such document or petition is in the nature of a pleading and is regarded in every material respect like the initial pleading in the trial court. (*Employers Ins. Co.* v. *Harrison*, 33 Ala. 199 [33 So.2d 260, 264]; *Cole* v. *Farrier*, 180 Va. 231 [22 S.E.2d 18, 25].) It is our view, however, that whether the appeal document in the present case is a pleading is not determinative of the question before us. ▮ The heart of the inquiry is whether Fibreboard made statements in its appeal document to the board of appeals contrary to the position it took in the instant lawsuit, so as to make such declarations admissible as admissions. The substance of the utterance, and not the form in which it is couched, is the determining factor. ▮ The distilled essence of the California rule, as declared by the cases hereinabove cited, is that the declaration or utterance must be one of *fact* and not a conclusion of law, opinion, legal contention, or argument. (See also *Achen* v. *Pepsi-Cola Bottling Co.*, 105 Cal.App.2d 113, 123 [233 P.2d 74]; *Kamm* v. *Bank of California*, 74 Cal. 191, 195-198 [15 P. 765]; *Mullinan* v. *Mercantile Trust Co.*, 80 Cal.App. 377, 384 [252 P. 647]; *People* v. *Byars*, 188 Cal. App.2d 794, 807 [10 Cal.Rptr. 677].)[19] In *Cullinan*, the court made this statement: "Where a cause is so conducted that the court and counsel may rightly and do infer that certain facts are conceded or admitted the court may so treat them. ..." (P. 384.) And in *Achen*, the reviewing court said: "[T]he exception to the hearsay rule which permits declarations or admissions by a party to be shown applies only to

---

[19]The rule advocated by modern textbook writers that a party's inconsistent utterances need not be such as to have been independently receivable as the testimony of a qualified witness because it is the inconsistency with the party's present claim which gives them logical force (4 Wigmore on Evidence, § 1053, p. 12; McCormick on Evidence, § 241, p. 507; Model Code of Evidence, rule 506; and see Witkin, Cal. Evidence, § 222(c), p. 249), is not the California rule. This is recognized in the 1962 Pocket Supplement of 4 Wigmore on Evidence, page 13 (note 4), wherein the *Achen* case is cited as being *contra*.

declarations or admissions of *fact* and not to the interpretation, legal or otherwise of the facts." (P. 123.) The *Achen* case holds that the views expressed by a party as to what he intended or thought the meaning of a contract to be are inadmissible as his opinion or conclusion, where the factual language of the contract on which the action is based is equally available and known to the parties and its interpretation is a matter for the court. In *Dolinar* v. *Pedone, supra,* 63 Cal.App.2d 169, the answer in a prior action failed to deny a direct allegation that one Bowman at the time of an accident was the agent of the defendant, Universal Film Exchange, Inc., and acting within the scope of his employment. The said answer was admitted in evidence against said defendant in a subsequent case arising out of the same accident as an admission of the *fact* that such agency existed. Similarly, in *Kamm,* a complaint in a prior action was held admissible in evidence against the plaintiff of the *fact* that the prior action had been brought, and of its nature, where the purpose was to show that the plaintiff was seeking, in the prior action, to recover the same moneys from a third person.

An analysis of the cases relied upon by Fibreboard discloses that they involve situations where the alleged inconsistent utterance was either a legal conclusion, an unauthorized statement, or a statement obviously not intended to be a stipulation of fact or a formal admission. Thus in *Adelstein* v. *Greenberg,* 77 Cal.App. 548, 552 [247 P. 520], a statement of counsel during the course of an argument on demurrer was held to be merely a legal conclusion and not a statement made as an admission or stipulation of fact. Similarly, in *Morrell* v. *Caldow,* 99 Cal.App. 159, 162 [278 P. 247], a statement by counsel, during an interchange between court and counsel regarding the number of outstanding shares in a stockholder's liability suit, that " 'they figured up nearer 800' " was held not to be intended as a stipulation or admission in the context and circumstances under which it was made. In *Shaver* v. *Canfield,* 21 Cal.App.2d 734, 742 [70 P.2d 507], a statement in a petition for guardianship inconsistent with a party's claim that certain property had been deeded to her was denied admission in evidence on the ground that it was prepared by an attorney without any direction as to its contents by the plaintiff and also upon the ground that such statement was merely a conclusion of the plaintiff. *Cullinan* v. *Mercantile Trust Co., supra,* 80 Cal.

App. 377, supports what we comprehend to be the California rule. There a declaration made by counsel for the respondents in his opening statement that certain allegations in the pleadings were admitted, and to which the appellants made no objection or reply, was held to constitute an admission of the truth of said allegations.[20]

Adverting to Exhibit "Q" in the present case, we find that it contains both statements of fact and legal conclusions. The statements in the three appeal documents were clearly statements of ultimate fact. It is there stated unequivocally that the decision of the referee is in error on the following grounds: "Claimants left their work on July 31, 1959 because of their respect for the picket line of Machinists' Union, Local 1304, and continued out of work for that reason until the picket line was removed from the entrance to their employer's establishment on September 4, 1959. . . ." We do not agree with counsel for Fibreboard that these statements are merely contentions or legal conclusions; nor do we subscribe to the proposition urged by Fibreboard that the situation in the present case is analogous to the pleading of inconsistent defenses in an answer.[21] In the latter regard, it suffices to say that the rule permitting inconsistent defenses is applicable to defenses set up in an answer in the *same* case. (Code Civ. Proc., § 441; *Oppenheimer* v. *Deutchman,* 119 Cal.App.2d 450, 453 [259 P.2d 457]; *Jones* v. *Tierney-Sinclair,* 71 Cal.App.2d 366, 373 [162 P.2d 669].) Such defenses may not be considered as admissions against interest *in the action in which the answer was filed.* (*Jones* v. *Tierney-Sinclair, supra,* at p. 373; *L. Mini Estate Co.* v. *Walsh,* 4 Cal.2d 249 [48 P.2d 666].) In *Jones,* it was held, however, that where a defendant alleges facts in an inconsistent defense in one action and those facts are inconsistent with the position taken by the same party in a subsequent action between such defendant and other parties, the first verified pleading may be used against the pleader as an ad-

[20]Research discloses other cases wherein the distinction between statements of fact, on the one hand, and conclusions of law, opinion, and argument, on the other, is apparent. (See *Sichterman* v. *R. M. Hollingshead Co.,* 117 Cal.App. 504, 506 [4 P.2d 181]; *Desny* v. *Wilder,* 46 Cal.2d 715, 729 [299 P.2d 257]; and see *People* v. *Byars,* 188 Cal.App. 2d 794, 807 [10 Cal.Rptr. 677].)

[21]Fibreboard concedes in its brief that it raised a defense in the unemployment compensation hearings inconsistent with its position in the present action.

mission against interest in the subsequent action. Although *Jones* is distinguishable from the present case in that the prior inconsistent statement was under oath, we are of the opinion that this distinction is not significant. The rationale of *Jones* is compatible with the general rule which does not restrict the admissibility of prior inconsistent statements to those made under oath. To hold that a party may plead inconsistent defenses in different proceedings without incurring procedural sanctions would stultify the rule which permits the use of pleadings in prior proceedings as evidentiary admissions in subsequent proceedings.

 As concerns the two transcripts of the oral argument by Fibreboard's counsel in the proceedings before the appeals board, which are also included in Exhibit "Q," these are clearly legal conclusions by way of argument, and, therefore, inadmissible as admissions under the rule hereinabove discussed.[22] We thus have a situation wherein Exhibit "Q" contains inadmissible as well as admissible evidence. The objection to such exhibit was, however, a general one. An inadmissible portion of a document, the remainder of which is admissible in evidence, cannot be reached by a general objection to the admission of the entire document, but the inadmissible portion must be specified. (*People* v. *Lang Transportation Corp.*, 43 Cal.App.2d 134, 141 [110 P.2d 464]; *Newton* v. *Thomas,* 137 Cal.App.2d 748, 768 [291 P.2d 503]; *Estate of De Laveaga,* 165 Cal. 607 [133 P. 307]; *Coveny* v. *Hale,* 49 Cal. 552, 556.) Accordingly, in the case at bench, the evidence being good in part, the general objection to the entire exhibit should have been overruled.[23]

Having concluded that Exhibit "Q" should have been admitted we must now determine whether its exclusion constituted prejudicial error. This determination presents the

---

[22]The pertinent portions of said argument are as follows:

" 'We submit in this case the members of this union, in compliance with the policy of the Labor Council and with their own individual convictions, had failed to report for work because of union principles and not because of any prevention by violence.' "

" 'We submit that was the real purpose there with respect to these men, that evidence was uncontradicted by them. They did not work because of their union principles and are therefore ineligible under the rules. ...' "

[23]It *is apparent from the record in the instant case that the trial* court sustained the objection to the admissibility of Exhibit "Q" on the ground that it was not admissible at all as an admission.

question whether such error requires a reversal in view of the provisions of article VI, section 4½, of the California Constitution.[24] ■■■ The test generally applicable is stated in *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243], as follows: ''That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'' ■■■ Applying this test to the record before us, we are of the opinion that it is not reasonably probable that a result more favorable to defendants would have been reached in the absence of the error in excluding Exhibit ''Q.'' As hereinabove stated the subject exhibit involved only the activities of the production workers. It was in no way related to the conduct or deportment of the warehousemen. An examination of the entire cause and the evidence adduced impels us to the conclusion that there was an abundance of evidence establishing tortious conduct on the part of defendants which caused the production workers to remain away from their work. This evidence consisted in the main of third-party objective evidence which established in detail the nature and extent of defendants' activities on the picket line. It does not appear reasonably probable to us that the admission in evidence of the statements of Fibreboard's attorneys in the unemployment compensation proceedings, when weighed against the abundant evidence presented through witnesses not parties or privy to the litigation, would have resulted in a different verdict.

*Did the Trial Court Commit Error in Refusing to Give Certain Instructions Proposed by Defendants?*

*No.* Defendants' defense, other than that set out in their affirmative defenses, rested on the public policy in California permitting a proper picket line to interfere with an employer's business without liability to the union. (See Lab. Code, § 923.) Defendants proposed certain instructions which they assert were consistent with this defense, and which the trial court refused to give. Error is accordingly claimed, based on

---

[24]This section, in pertinent part, provides: ''No judgment shall be set aside, ... in any case, on the ground ... of the improper admission or rejection of evidence, ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.''

714

the premise that the trial court did not instruct on a theory supported by the pleadings and the evidence. The instructions submitted by defendants on this theory of defense and which were not given by the court are set out in the footnote.[25]

The crucial issue for the jury's determination in the in-

[25]Instruction No. 35: ''The law in California recognizes that picketing by a labor union can and usually does interfere with and cause a loss of business and profits of the employer against whom the picketing is directed. When the picketing is for a legitimate labor objective, and in this case, the object of the picketing was such a legitimate objective, and the behavior on the picket line is lawful, neither a union nor its members are liable in damages for the results of such picketing.

''If you find that the behavior of the Defendants, or any of them, in the picketing activity was reasonable in the light of the circumstances, then you must find that the Defendants or any of them are not liable for the damages claimed by the Plaintiff.''

Instruction No. 36: ''The law recognizes that the right to strike and picket includes the possibility of some disorder in any extensive or long drawn-out strike. Engaged in the activities are human beings whose feelings are stirred to the depths.

''Rising tempers can call forth hot words which in turn can lead to blows. Such unfortunate developments are hard to prevent, even when cool heads direct the picketing.

''By this Instruction I do not mean that the law excuses intimidation on the picket line. This would exceed the bounds of proper conduct. However, isolated incidents of vigorous behaving in picketing do not make the entire picketing activity unlawful, nor do such isolated incidents make a union liable for damages to an employer's business caused by picketing.''

Instruction No. 37: ''Picketing is more than free speech, since the very presence of the picket line can induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Nevertheless, such picketing is protected by our Constitution.

''The right of free speech in picketing cannot be denied by drawing from a trivial rough incident or a moment of animal exuberance the conclusion that otherwise peaceful picketing has the taint of force.''

Instruction No. 38: ''The occurrence of unlawful behavior, if any, in the vicinity of Plaintiff's Emeryville plant at the time of the picketing activity, is not by itself enough to connect the wrongdoing to the Defendants.

''The Plaintiff is required to establish by a preponderance of the evidence that the Defendants, and each of them, were responsible for such behavior, if any.''

Instruction No. 39: ''The Defendant Unions had a picket line before the entrance to Plaintiff's Emeryville plant from July 31 to September 4, 1959. This picket line interfered with the Plaintiff's business and caused loss of sales.

''I instruct you that the law in California is that such picketing, if for a lawful object and by lawful means, does not render the picketing

stant case was whether defendants' labor activities were lawful and proper. ▆▆▆ It is well settled in this state that, while a union may use the various forms of concerted action, such as a strike, picketing or boycott, to enforce an objective that is reasonably related to any legitimate interest of organized labor, the object of concerted labor activity must be proper and must be sought by lawful means. ▆▆▆ If such activity is not proper or lawful the persons injured by such activity may obtain damages or injunctive relief. (*James* v. *Marinship Corp.*, 25 Cal.2d 721, 728-729 [155 P.2d 329, 160 A.L.R. 900]; *Messner* v. *Journeymen Barbers etc. International Union*, 53 Cal.2d 873, 876-877 [4 Cal.Rptr. 179, 351 P.2d 347].) ▆▆▆ Accordingly, damages may be awarded for tortious conduct. (*Garmon* v. *San Diego Bldg. Trades Coun-*

unions and its members liable for the loss of sales that result from the picket line.

"Plaintiff claims it suffered damages different from or in addition to the loss of sales from a lawful picket line because of acts of intimidation and coercion on the picket line for which Defendant Lloyd Ferber was responsible.

"Plaintiff must prove by a preponderance of the evidence that the loss of sales it suffered was proximately caused by acts of intimidation and coersion on the picket line, if such acts occurred.

"If you find that acts of coersion and intimidation on the picket line did not occur, or were not the acts of the Defendant Lloyd Ferber, then there is no basis for charging this Defendant with the damages claimed by the Plaintiff, and you will find for this Defendant.

"If you find that acts of coersion and intimidation did occur, and were acts attributable to Defendant Lloyd Ferber, but if you find that such acts were not the proximate cause of the loss of sales (that is, the damages occurred but for other reasons than this Defendant's coersion and intimidation, if any), then you will find for this Defendant.

"If you find that the loss of sales were [*sic*] proximately caused by acts of coersion and intimidation attributed to Defendant Lloyd Ferber and such loss of sales damaged the Plaintiff, then, and only then, you will find for the Plaintiff as to this Defendant.

"It is only if you reach this conclusion that you will consider the amount of damages to award."

(Note: Instructions Nos. 40-43 are identical with Instruction No. 39, except that each applies to one of the defendants.)

Instruction No. 45: "The mere presence of individuals in the vicinity of the Plaintiff's Emeryville plant at the time of the picketing does not make these individuals agents of the Defendants Unions. Strikes, lockouts, and picketing activity, by their nature, become public events and attract crowds of people who may be affected by the outcome of the activities. The crowds may show their sympathies for one side or the other, but their actions are not attributable to the Defendants unless these individuals are proved to be agents."

716

*cil*, 49 Cal.2d 595, 602-606 [320 P.2d 473] ; *Seven Up Bottling Co.* v. *Grocery Drivers Union*, 49 Cal.2d 625, 628 [320 P.2d 492].) Such tortious conduct may consist of violent conduct, physical violence, threats and intimidation (*United Constr. Workers* v. *Laburnum Const. Corp.*, 347 U.S. 656 [74 S.Ct. 833, 98 L.Ed. 1025]) ; and it may also consist of nonviolent conduct where the labor union activities amount to illegal practices in violation of the declared policy of California. (*Garmon* v. *San Diego Bldg. Trades Council, supra*, at pp. 602-606.)

In the case at bench, the trial court gave two instructions which, we are satisfied, properly declared to the jury the principles applicable to an award of damages for tortious conduct.[26]

 Turning to proposed Instruction No. 35, we find that although the first paragraph is a correct statement of the declared policy of the law of this state as regards peaceful picketing,[27] the second paragraph erroneously states the duties and obligations of defendants with respect to such picketing. This portion of the instruction would have advised the jury that it should find for defendants if their behavior "in the picketing activity was reasonable in the light of the circumstances. . . ." The test of liability is not whether the conduct of defendants was reasonable in the jury's estimation, but whether such conduct amounted to unlawful tor-

---

[26]These instructions were as follows:

"Members of a Union have a right to peacefully patrol or stand near the approach to a business establishment in order to persuade workmen employed there to withhold their labor, to attempt to persuade the public of the justness of their cause, or to accomplish proper economic goals.

"However, neither the officers, members nor other representatives of a Union have the right to conduct mass picketing, to intimidate or coerce others, to cause violence, or to make threats of violence as a part of picketing or otherwise; and such actions are a proper basis upon which to award damages for loss or injury incurred as a proximate result thereof.

"The use of vile and abusive language and the threats of violence, if any, amount to physical intimidation which may not be justified under any principles governing the rights of persons engaged in labor disputes, and such actions, if any, may give rise to a cause of action for damages."

[27]This principle was adequately covered by the instructions given by the court as set out in fn. 26. Moreover, the question whether the picketing was pursuant to a legitimate objective was not an issue in the case, nor was it raised by the evidence in the case.

tious conduct.[28] Essentially, the issue before the jury was whether defendants' picketing was peaceful, i.e., whether their conduct in connection with their picketing activities amounted to a tort for which an action in damages will lie.[29] (*Garmon* v. *San Diego Bldg. Trades Council, supra,* at p. 606.) It is clear that while a person's conduct may be reasonable as viewed by others, it may, nevertheless, be tortious.

 Where a portion of a proposed instruction is erroneous, misleading or incomplete, the court may properly refuse the entire instruction, there being no duty on the court to cull out what is proper from what is not; nor is the court under a duty to modify such instruction or give others in lieu of it as long as the jury is properly instructed as to the law of the case. (*Huggans* v. *Southern Pacific Co.,* 92 Cal. App.2d 599, 614 [207 P.2d 864] ; *Jaeger* v. *Chapman,* 95 Cal. App.2d 520, 525 [213 P.2d 404].)

Proposed instructions numbered 36 and 37 appear to be a paraphrase of certain language taken from opinions in the cases cited in support of the principle therein contained.[30]

---

[28]In Civil Code section 1667 it is provided as follows: "That is not lawful which is: 1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; ..."

[29]"The law of this state imposes upon everyone the duty 'to abstain from injuring the person or property of another, or infringing upon any of his rights.' (Civ. Code, § 1708.) There is a breach of such legal duty when one who performs an act not authorized by law infringes upon a right another is entitled to enjoy, or causes a substantial material loss to another. That breach constitutes the commission of a tort, under the laws of this state, for which an action in damages will lie." (*Garmon* v. *San Diego Bldg. Trades Council, supra,* at p. 606.)

[30]The first two paragraphs of Instruction No. 36 are taken from *Republic Steel Corp.* v. *National Labor Relations Board.,* 107 F.2d 472, 479. They are not verbatim quotations, nor did the case involve the giving of jury instructions. The last paragraph relating to "isolated incidents" is taken from *National Labor Relations Board* v. *Thayer Co.,* 213 F.2d 748, 756, with the addition of certain embellishments not found in *Thayer.*

The first paragraph of Instruction No. 37 is taken from the concurring opinion of Justice Douglas in *Bakery & P. Drivers etc. Local* v. *Wohl,* 315 U.S. 769, 776 [62 S.Ct. 816, 86 L.Ed. 1178, 1184], with a substitution of language in the last line of the quotation, i.e., "Nevertheless, such picketing is protected by our Constitution, " for "Hence those aspects of picketing make it the subject of restrictive regulation." The second paragraph presumes to derive its support from dictum in the opinion of Justice Frankfurter in *Milk Wagon Drivers Union* v. *Meadowmoor Dairies, Inc.,* 312 U.S. 287, 293 [61 S.Ct. 552, 85 L.Ed. 836, 841, 132 A.L.R. 1200, 1203], wherein he was expressing the reason for the

The dangerous practice of taking excerpts from the opinions of courts of last resort and indiscriminately changing them into instructions to juries has been frequently criticized by the courts of this state. (See *Francis* v. *City & County of San Francisco,* 44 Cal.2d 335, 341 [282 P.2d 496]; *Sloan* v. *Stearns,* 137 Cal.App.2d 289, 299-300 [290 P.2d 382]; *Reagh* v. *San Francisco Unified School Dist.,* 119 Cal.App.2d 65, 73 [259 P.2d 43].) In the subject instructions defendants have taken snippets from several opinions and nimbly concatenated them into distorted and inadequate statements of legal principles. The resultant products were not only incomplete and misleading instructions, but they were argumentative in character. The purport of these instructions was to convey the idea that "isolated incidents of vigorous behaving," "trivial rough incidents" or "moments of animal exuberance" could not constitute tortious conduct. This is not necessarily so, as one incident of "vigorous behavior" or "animal exuberance" or "a rough incident," considered trivial by the perpetrator, might well constitute a tort so as to justify an award of damages. Instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. (See *Lenard* v. *Edmonds,* 151 Cal.App.2d 764, 774-775 [312 P.2d 308]; *Dodge* v. *San Diego Electric Ry. Co.,* 92 Cal.App.2d 759, 764 [208 P.2d 37]; *Hicks* v. *Ocean Shore Railroad, Inc.,* 18 Cal.2d 773, 783 [117 P.2d 850].) Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. (*Dodge* v. *San Diego Electric Ry. Co., supra,* at p. 764; *Chutuk* v. *Southern Counties Gas Co.,* 21 Cal.2d 372, 381 [132 P.2d 193].) Accordingly, the trial court was justified in refusing to give proposed Instructions Nos. 36 and 37.

Instruction No. 38 deals with burden of proof and preponderance of evidence. Instruction No. 45 is simply an elaboration of the agency instruction given by the court. These

court's decision. We do not see in Justice Frankfurter's language what defendants have distilled from it. What he said, in context with other language preceding it, is as follows: "But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution."

principles were adequately covered by other instructions given by the trial court. Error cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given. (*Luis* v. *Cavin*, 88 Cal.App.2d 107, 115 [198 P.2d 563] ; *Middleton* v. *Post Transportation Co.*, 106 Cal.App.2d 703, 706 [235 P.2d 855].) Instructions Nos. 39 to 43 are not only repetitive of the instructions on preponderance of evidence and proximate cause given by the court, but are also argumentative formula instructions. What we have hereinabove said concerning argumentative and repetitive instructions is likewise applicable to these instructions. It has been repeatedly stated by the reviewing courts that formula instructions ought not to be given and their final disappearance should be encouraged. (*Taha* v. *Finegold*, 81 Cal.App.2d 536, 543 [184 P.2d 533] ; *Rios* v. *Bennett*, 88 Cal.App.2d 919, 924-925 [200 P.2d 73].) Accordingly, the refusal to give formula instructions is not error. (*Roy* v. *Mission Taxi Co.*, 101 Cal.App.2d 438, 446-447 [225 P.2d 920].)

### *Did the Trial Court Commit Error With Respect to Instructions on Provocation?*

 *No.* Defendants' next charge of error is that the trial court failed to instruct the jury on the defense of provocation based on fraudulent misrepresentation. This defense was urged in defendants' seventh affirmative defense. The evidence adduced before the jury in support of this defense was as follows: On May 26, the Union sent a letter to Fibreboard notifying it that the Union desired to modify the existing collective bargaining agreement between the parties as of August 1, and therein offered to meet with Fibreboard "for the purpose of negotiating a new contract." On June 2, Fibreboard acknowledged, by letter, the receipt of the Union's letter of May 26, "requesting a meeting to discuss modifications of the current Agreement. . . ." Said letter stated that Fibreboard would contact the Union at a later date regarding a meeting for this purpose. Ferber testified that on or about June 15 he had occasion to telephone Thumann concerning a plant problem, and that at that time he asked Thumann if he had received copies of the proposed modifications to which Thumann replied that he had not. On or about June 22, Ferber telephoned Thumann and asked him if he had received the modifications to which Thumann replied that he had, but that he had not had time to study them, that

he would study them and then give Ferber a call either the last of the month or the first of July. Ferber did not receive a call from Thumann, so he telephoned Thumann again in the latter part of June and early in July, but was unable to talk with him. On July 27, Ferber and Stumpf met with Thumann at which time Thumann advised them that Fibreboard had decided to contract out the maintenance work. Thumann then handed Ferber and Stumpf copies of a letter dated July 27 addressed to each of them from Fibreboard stating that the latter had reached a definite decision to let out the maintenance work to an independent contractor as of August 1st and that negotiation of a new contract would be "pointless." This letter acknowledged that on June 15 the Union had "forwarded" its "contract proposals."[31] Thumann testified that the meetings with Ferber and Stumpf were held off until Fibreboard could reach a decision as to whether it would discuss the modification or would announce that it would contract out the maintenance work. Ferber testified that he was perturbed and angered when termination notices were handed out to the members of the Local. Several other members of the Local, called as witnesses, testified that they were upset or angered when they received notices terminating their employment.

At the conclusion of the trial, defendants submitted five identical instructions,[32] each applicable to one of the defendants, upon the theory of defense based upon provocation resulting from fraudulent misrepresentation. The said instructions were to the effect that in its consideration of exemplary damages the jury must consider to what extent the acts of the respective defendants were provoked by Fibreboard or its agents, that "[s]uch provocation could be misrepresentation by the Plaintiff's agent in connection with the failure to hold collective bargaining negotiations in June and July, 1959," and that it was for the jury to decide if Thumann's representations were fraudulent and whether such fraudulent misrepresentations could provoke the named defendant into acts which the jury might decide gave rise to exemplary damages. The proposed instruction then defined "fraudulent misrepresentation" and concluded as follows: "If you find that the Defendant ... was provoked by the acts of the Plaintiff, or

---

[31]The nature of the Union's proposed modifications or contract proposals are not disclosed by the record.

[32]Instructions Nos. 48 to 52, inclusive, as modified.

any of its agents, then you may not now award exemplary damages." The trial court refused to give these proposed instructions. Prejudicial error is accordingly claimed, it being defendants' assertion that, by reason of such refusal, the court "gave no instructions at all on the defense of provocation." This last assertion is not accurate because the record discloses that the trial court gave two instructions relative to the defense of provocation.[33]

Provocation may only be considered with respect to the issue of punitive damages. Acts of provocation, however, do not absolutely bar recovery for exemplary damages but are to be considered in reduction of, or setoff against, such damages. (*Earl* v. *Times-Mirror Co.*, 185 Cal. 165, 177 [196 P. 57]; *Marriott* v. *Williams*, 152 Cal. 705, 710 [93 P. 875, 125 Am.St.Rep. 89].) In the present case the evidence was sufficient to justify an instruction that the conduct and actions of Fibreboard might be considered in mitigation of exemplary damages. Defendants were, therefore, entitled to an instruction on provocation in mitigation of exemplary damages as this was one of their theories of defense. The instruction submitted by them on the issue of provocation was not, however, a correct exposition of the law. This instruction, as framed, did not tell the jury that acts of provocation were to be considered in mitigation of punitive damages, but instructed that if the jury found provocation they were not to award any punitive damages at all. Although it is the trial court's duty to give instructions expounding the law upon every reasonable theory of the case finding support in the evidence (*Daniels* v. *City etc. of San Francisco*, 40 Cal.2d 614, 623 [255 P.2d 785]; *Wilbur* v. *Cull*,

---

[33]The trial court's instructions were as follows:

"The Defendants have pleaded provocation as a defense to this action. You are instructed that this defense applies only to the claim for punitive damages and is not to be considered by you in determining the compensatory damages to be awarded to Plaintiff, if any.

"In connection with the defense of provocation, certain evidence has been received by the Court which relates to the feelings or state of mind of the members of the Defendant Unions.

"This evidence is to be considered by you for the limited purpose of determining whether or not the Defendants or any of them should be held liable for punitive damages; and, if so, for what amount."

The trial court also gave instructions defining punitive damages; instructed that such damages "are proper where the Defendants have been guilty of oppression, malice or fraud"; and defined "malice" and "oppression."

145 Cal.App.2d 41, 43 [302 P.2d 41]), no duty is cast upon the court to modify and give as modified a proposed incomplete or erroneous instruction. (*Shaw* v. *Pacific Greyhound Lines*, 50 Cal.2d 153, 158 [323 P.2d 391]; *Merrill* v. *Buck*, 58 Cal.2d 552, 563-564 [25 Cal.Rptr. 456, 375 P.2d 304].) The record discloses, however, that the court did, on its own motion, instruct the jury on the defense of provocation. This instruction was to the effect that the evidence received as to the feelings or state of mind of the members of the defendant unions was to be considered by the jurors in "determining whether or not the Defendants or any of them should be held liable for punitive damages; *and, if so, for what amount.*" (Italics added.) This instruction was likewise an incomplete and erroneous instruction. Like that proffered by defendants, it carried the connotation that if they found that there was provocation on the part of Fibreboard they were not to assess punitive damages. Accordingly, it was more favorable to defendants than the proper instruction which would have advised the jury that it was only to consider provocation, if it existed, in mitigation of damages. ██ A party cannot complain of an instruction more favorable to him than that to which he is entitled. (*Hom* v. *Clark*, 221 Cal.App.2d 622, 639 [35 Cal.Rptr. 11]; *Smith* v. *Sugich Co.*, 179 Cal.App.2d 299, 309 [3 Cal.Rptr. 718].) ██ Assuming *arguendo* that the trial court's instruction was merely incomplete and that it was a correct statement of the law so far as it went, it was defendants' duty to propose a more detailed and correct instruction on the subject. (*Merrill* v. *Buck, supra*, at p. 563; *State Rubbish etc. Assn.* v. *Siliznoff*, 38 Cal.2d 330, 340 [240 P.2d 282]; *Bouse* v. *Madonna Constr. Co.*, 201 Cal.App.2d 26, 31 [19 Cal.Rptr. 823].)

*Did the Trial Court Commit Error in Instructing That the Collective Bargaining Agreement Was Terminated and Was not Breached by Fibreboard?*

██ *Yes.* Defendants contend that the trial court committed prejudicial error when it instructed the jury that the collective bargaining agreement between Fibreboard and the Union terminated on July 31, and that Fibreboard did not breach said contract in any respect. Initially, the court permitted the introduction of evidence relative to whether there was a termination or breach of the contract as bearing on the issue of provocation. At the end of the second week of trial

the court ruled that as a matter of law the contract terminated on July 31 pursuant to its own terms and conditions.

The basis of claimed error is that the trial court erroneously interpreted the contract, and that the court's instruction, predicated upon such interpretation, had the prejudicial effect of discrediting defendants' witnesses who testified that they were relying upon the existence of a valid and binding contract. Defendants urge that the interpretation of the contract is controlled by the manifest intent of the parties, as shown by their conduct prior to the controversy. Such conduct, say defendants, is evidenced by the communications between the parties with respect to the negotiations relative to the modifications requested by the Union. The thrust of defendants' argument, therefore, is that the parties themselves treated the contract as an existing contract as to all of its terms, excepting those which had been reopened for negotiation by virtue of the request for modification.

We would here point out that whether the contract was breached is not vital to the issue of violence because a breach of a collective bargaining contract does not justify a resort to tortious conduct. Such breach is, however, relevant to the defense of provocation as a mitigating circumstance with respect to punitive damages. Accordingly, the question whether the contract was in fact breached was a circumstance justifying an instruction on the limited issue of provocation. In the present case the jury was merely told that the contract was terminated and that it was not breached by Fibreboard. Although limited to the question of provocation such instruction was not erroneous if it constituted a correct statement of the law. Its effect was to completely remove the question of contract termination or breach from the jury's consideration.

Our inquiry is therefore directed to whether the trial court's interpretation of the contract was correct. Defendants do not contend that Fibreboard breached said contract other than by its action in terminating it. The core of the inquiry, then, is whether the contract terminated pursuant to its own terms and conditions. If the construction of the contract is based upon its terms without the aid of extrinsic evidence, its construction is one of law and we are not bound by the trial court's interpretation. (*Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825] ; *Meyer* v. *State Board of Equalization, supra*, 42 Cal.2d 376, 381; *Estate of Black*, 211

Cal.App.2d 75, 83 [27 Cal.Rptr. 418].) It is the duty of the appellate court, therefore, to make the final determination in accordance with applicable principles of law. (*Meyer* v. *State Board of Equalization, supra,* at p. 381; *Estate of Platt, supra,* at p. 352.) It is also the rule that where no extrinsic evidence has been introduced, the interpretation placed upon the contract by the trial court will be accepted by the reviewing court if such interpretation is reasonable, or if the interpretation of the trial court is one of two or more reasonable constructions of the instrument. (*Prickett* v. *Royal Ins. Co., Ltd.,* 56 Cal.2d 234, 237 [363 P.2d 907, 86 A.L.R.2d 711] ; *Lundin* v. *Hallmark Productions, Inc.,* 161 Cal.App.2d 698, 701 [327 P.2d 166].) In the case at bench no contention is made by defendants that the contract in question is ambiguous so as to require the aid of extrinsic evidence ; nor was any such evidence received. The evidence received relative to the communications between the parties concerning renegotiation of certain suggested modifications was not in the nature of extrinsic evidence received to aid in the contract's interpretation, but evidence of what the parties *did* relative to the modification or termination of the contract. The rule asserted by defendants that the construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court, is not applicable here. This rule of interpretation comes into play when extrinsic evidence is resorted to for the purpose of explaining the intention of the parties. (See *Woodbine* v. *Van Horn,* 29 Cal.2d 95, 104 [173 P.2d 17].)

 Adverting to the subject contract, we are satisfied that the construction placed by the trial court upon the pertinent clause under consideration was not a reasonable one.[34]

---

[34]The pertinent provisions of said clause read as follows:

"This Agreement shall continue in full force and effect to and including July 31, 1959, and shall be considered renewed from year to year thereafter between the respective parties unless either party hereto shall give written notice to the other of its desire to change, modify, or cancel the same at least sixty (60) days prior to expiration.

"Within fifteen (15) days after notice of reopening is given, the opening party shall submit a complete and full list of all proposed modifications. All other sections shall remain in full force and effect. Negotiations shall commence no later than forty-five (45) days prior to the anniversary date of the Agreement unless otherwise mutually changed."

The first paragraph of the pertinent clause provides that the contract continues in full force and effect until July 31, 1959, and that it shall be considered renewed from year to year thereafter unless either party should give written notice to the other of its desire to change, modify or cancel the same at least 60 days prior to expiration. In the second paragraph thereof, it is provided that within 15 days "after notice of reopening is given, the opening party shall submit a complete and full list of all proposed modifications" and that "[a]*ll other sections shall remain in full force and effect.*" (Italics added.) In our opinion, the reasonable interpretation to be placed upon the entire clause is as follows: that unless either party gives a written notice to the other of its desire to cancel the contract at least 60 days prior to its expiration date, the contract is renewed for another year; that where a written notice of a desire to change or modify the contract is given 60 days prior to such expiration date, the provisions of the contract concerning which no change or modification is requested are to remain in effect while the parties negotiate the proposed modifications. We accordingly conclude that the trial court erroneously determined that the subject contract terminated as a matter of law pursuant to its own terms and conditions. Whether the contract was in fact terminated or whether it was still in existence subject to modification were questions of fact for the jury requiring appropriate instructions.

### Did the Trial Court Commit Errors of Procedure Which Denied Defendants a Fair Trial?

*No.* Defendants contend that the trial court abused its discretion when it denied their motion, made during the course of the trial, to amend their answer by adding a sixth affirmative defense. This proposed defense asserted that as a result of the alleged fraudulent misrepresentations on the part of Fibreboard, relative to the negotiations with respect to the collective bargaining agreement, Fibreboard did not come into court with "clean hands" and therefore was not entitled to the relief requested in its complaint. The record discloses that the trial court had, during the trial, allowed evidence concerning the proposed modifications to the collective bargaining agreement and the attempts to negotiate the same as relevant to the second affirmative defense asserting "unclean hands" and the third affirmative defense alleging

"provocation." Later, in the course of the trial, the court below concluded that under the pleadings the defenses of "unclean hands" and "provocation" were restricted to Fibreboard's alleged breach of contract. When the trial court ruled that Fibreboard did not breach the contract as a matter of law, defendants thereupon sought to amend their answer by adding said sixth defense, and, at the same time, proposed to add a seventh affirmative defense which alleged the said fraudulent misrepresentations as a basis for "provocation." The trial court permitted the seventh defense, but denied the amendment as to the sixth defense.

The general rule is that motions to amend an answer during the course of a trial are addressed to the sound discretion of the court and its ruling will not be disturbed on appeal in the absence of a clear abuse of discretion. (*Moss Estate Co.* v. *Adler,* 41 Cal.2d 581, 585-586 [261 P.2d 732] ; *Peterson* v. *Peterson,* 74 Cal.App.2d 312, 323 [168 P.2d 474] ; Code Civ. Proc., § 473.) In the present case the defense of provocation based on fraudulent misrepresentations was permitted and the evidence adduced thereunder was before the jury for its consideration under that issue. As we have hereinabove pointed out, the factual question as to whether there was a breach or termination of the contract should likewise have been submitted to the jury on the provocation issue. Our inquiry is therefore directed to whether the trial court abused its discretion in not permitting the defense of unclean hands based upon the alleged fraudulent misrepresentations.[35]

The defense of unclean hands must be raised in the trial court to be available. Accordingly, it must be pleaded or called to the attention of the trial court in order that it may pass on the defense and also to permit the person against whom it is sought to be applied the opportunity to present such evidence as might bear on that issue. (*Stone* v. *Lobsien,* 112 Cal.App.2d 750, 758 [247 P.2d 357] ; *Watson* v. *Poore,* 18 Cal.2d 302, 311-312 [115 P.2d 478] ; *Scannell* v. *Murphy,* 82 Cal.App.2d 844, 849 [187 P.2d 790] ; *Sears, Roebuck & Co.* v. *Blade,* 139 Cal.App.2d 580, 594 [294 P.2d 140] ; *Moriarty* v. *Carlson,* 184 Cal.App.2d 51, 57-58 [7 Cal.Rptr. 282] ; and see

---

[35]It should be here pointed out that while the trial court ruled that as a matter of law there was no breach of contract, it did not strike the second affirmative defense which raised the defense of unclean hands based upon a breach of contract on the part of Fibreboard.

*Katz* v. *Karlsson*, 84 Cal.App.2d 469, 474-475 [191 P.2d 541], where it was held, in a case involving flagrantly unconscionable conduct, that a court may *sua sponte* apply the clean hands doctrine on grounds of public policy and as a means of protecting the court's integrity.) Moreover, the application of the doctrine raises primarily a question of fact. (*Boericke* v. *Weise*, 68 Cal.App.2d 407, 418 [156 P.2d 781].)

Traditionally, the doctrine of unclean hands is invoked when one seeking relief in equity has violated conscience, good faith or other equitable principles in his prior conduct. (*General Elec. Co.* v. *Superior Court*, 45 Cal.2d 897, 899-900 [291 P.2d 945]; *DeGarmo* v. *Goldman*, 19 Cal.2d 755, 765 [123 P.2d 1].) Accordingly, one who violates his contract cannot have recourse to equity to support that violation. (*DeGarmo* v. *Goldman, supra,* at p. 764; *Gavina* v. *Smith*, 25 Cal. 2d 501, 506 [154 P.2d 681].) In the case at bench Fibreboard sought both injunctive relief and damages against defendants. Thus Fibreboard sought both equitable and legal relief. It cannot be questioned that the defense of unclean hands may be urged against a party seeking the aid of equity by way of an injunction. In the instant case, however, injunctive relief was denied Fibreboard. Defendants cannot be heard to complain, therefore, that they were prevented from urging the doctrine of unclean hands insofar as the equitable relief sought by Fibreboard is concerned. Defendants urge, however, that the defense was likewise available against Fibreboard's legal action for damages. The question as to whether the equitable defense of unclean hands applies as a defense to a legal action appears to be of first impression. There is no California authority expressly holding that the equitable defense of unclean hands is applicable to a demand for money damages. That such a defense is available appears to be the holding of *A. I. Gage Plumbing Supply Co.* v. *Local 300 of Internat. Hod Carriers*, 202 Cal.App.2d 197, 206 [20 Cal.Rptr. 860, 92 A.L.R.2d 1223]. There a plumbing contractor brought an action against a laborers union and others for injunctive relief to prevent breach of a collective bargaining agreement, and, by way of a supplemental complaint, sought damages resulting from the alleged breach of contract. Damages were awarded the plaintiff. On appeal the defendants attacked the award of damages, one of the grounds being that the plaintiff was guilty of inducing the breach of contract and therefore had " 'unclean hands'

which should deny it the right to seek damages.'' (P. 206.) The opinion does not disclose whether the defense was urged in the court below, nor does it indicate whether any contention was made before the reviewing court that the defense was inapplicable. The appellate court did hold, however, that the plaintiff did not have unclean hands, but acted in good faith when it terminated a subcontract in order to avoid difficulties with the plumbers' union, with which it had a separate collective bargaining agreement, after learning that the subcontractor was going to assign the work in question to laborers. In *Morrison* v. *Willhoit*, 62 Cal.App.2d 830, 838 [145 P.2d 707], it was held that the fact that a complaint presents only a legal demand does not prevent the application of equitable principles to the case. In that case the action was on certain promissory notes executed by the defendants as a result of a transfer of the plaintiff's properties for the purpose of defrauding a creditor. Equitable relief was there granted to the defendants on the ground that the plaintiff's demand stemmed from the original tainted arrangement.

██ We are satisfied that the equitable defense of unclean hands is available in this state as a defense to a legal action. ██ We are persuaded to this conclusion, moreover, because in California, a defendant may set up as many defenses as he may have, regardless of the question as to whether they are of a legal or equitable nature, because the distinction which exists under the common law between actions at law and suits in equity, and the forms thereof, have been abolished. (See *Carpentier* v. *City of Oakland*, 30 Cal. 439, 442-443.) As stated in *Terry Trading Corp.* v. *Barsky*, 210 Cal. 428, 437 [292 P. 474], ''It is well settled that under the system of code pleading equitable defenses and equitable counterclaims may be set up in actions at law, as well as legal defenses and counterclaims in suits in equity.''

██ It is equally well settled in this state, however, that it is not every wrongful act nor even every fraud which prevents a suitor in equity from obtaining relief. The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants. ██ Accordingly, relief is not denied because the plaintiff may have acted improperly in the past or because

such prior misconduct may indirectly affect the problem before the court. (*Bradley Co.* v. *Bradley,* 165 Cal. 237, 242 [131 P. 750]; *Germo Mfg. Co.* v. *McClellan,* 107 Cal.App. 532, 541-543 [290 P. 534]; *Carman* v. *Athearn,* 77 Cal. App.2d 585, 598 [175 P.2d 926]; *Treager* v. *Friedman,* 79 Cal.App.2d 151, 173 [179 P.2d 387]; *Sheppard* v. *Wilcox,* 210 Cal.App.2d 53, 61-62 [26 Cal.Rptr. 412].) As was said in *Moriarty* v. *Carlson, supra,* 184 Cal.App.2d 51: " 'The misconduct must infect the cause of action before the court. . . . A party may have relief in connection with a transaction itself untainted although his original title may have been tainted by improper conduct. . . .' " (P. 57.) And in *Boericke* v. *Weise, supra,* 68 Cal.App.2d 407, 419, the court said: "Of course if a party comes into a court of equity with unclean hands relating to the transaction before the court, he will be denied relief. But in determining that issue the trial court can properly consider only whether the moving party has clean or unclean hands in relation to the matters properly before the court. The trial of the issue relating to clean hands cannot be distorted into a proceeding to try the general morals of the parties." Applying these principles to the case at hand, we find that the assertion of unclean hands is not directed to the "transaction" before the court in the instant case. That transaction involves whether defendants were guilty of tortious conduct. It would amount to a straining of the doctrine to hold that defendants could escape liability for tort because Fibreboard breached its contract or because it was guilty of fraudulent misrepresentations. The wrong done to Fibreboard, which is the basis of its cause of action for damages, is independent of the transaction arising from the alleged breach of contract or misrepresentations. To hold otherwise would be to sanction an assault upon a person who has perpetrated a fraud upon or breached a contract with the assaulter. Retribution for Fibreboard's breach of contract or fraudulent misrepresentations, if such existed, cannot be vindicated under the doctrine of unclean hands. Accordingly, the trial court did not abuse its discretion in denying the subject amendment.

Error is also claimed on the part of the trial court in that it failed to inform counsel prior to argument of the instructions it proposed to give as provided in Code of Civil Procedure section 607a. This requirement is only applicable when counsel *request* that they be so advised. In the absence

of such a request the trial court is not obliged to advise counsel of the instructions to be given. The record discloses that neither counsel made such a request in the instant case. Defendants can hardly be heard to complain that they were prejudiced because of the failure to inform as to the instructions to be given on the basis that the trial court "flipped through the proposed instructions," particularly when counsel for defendants, contrary to the provisions of section 607a,[36] delivered to the court and served upon counsel for Fibreboard their proposed instructions after both sides had rested their case. It appears from the record, moreover, that the instructions were discussed between court and counsel prior to argument and that the court gave its reactions to the proposed instructions. Under the circumstances, we perceive no error.

Defendants' final contention is that the verdict forms were confusing and biased against them. The trial court submitted two forms of verdict to the jury. One form was to be used in the event the jury should find for Fibreboard; the other if they should find for defendants. The trial court instructed the jury that if they found for plaintiff they were to insert the amount of compensatory damages and were to write in the names of defendants against whom such damages were assessed. On the same form and below the appropriate language for awarding compensatory damages was typed appropriate language for awarding punitive damages with the names of each of the defendants typed in and a blank line with a dollar sign after each name. While the jury was deliberating defendants interposed objections to the forms of verdict. Shortly thereafter, the jury returned to the courtroom for further instructions. At that time the court instructed the jurors that if they had "any problems at all with the forms of verdict" they should advise the bailiff and that then the court would go over the forms with them. At that time counsel for defendants requested that the jury be instructed: "That the fact that the verdict forms have dollar signs and an amount does not necessarily mean they must fill in that amount. If the finding is for 'Zero,' they may do that, likewise." To this request the court stated: "That is correct. All right. Now, are there any other questions?" There was no

[36]This tardy presentation was apparently with the trial court's acquiescence and without objection on the part of Fibreboard.

response from any of the jurors, whereupon the jury resumed its deliberations.

Subsequently, the jury returned to the courtroom and announced that it had reached a verdict. The verdict as then read by the clerk declared that the jury found in favor of plaintiff and assessed compensatory damages in the sum of $285,000 against "Defendants: East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO" and assessed exemplary damages "against the Defendants as follows: East Bay Union of Machinists, Local 1304, $4,000.00; United Steelworkers of America, AFL-CIO, $20,000.00; Lloyd Ferber, $0; William F. Stumpf, $0; Dave Arca, $0." The trial court then queried the foreman of the jury as to the manner in which the designated defendant was listed in the portion providing for compensatory damages and asked whether it was one defendant or whether it was intended to include both the Local and the International. The foreman responded that it included both. The trial court then asked whether insofar as the three individual defendants were concerned the jury found in their favor. To this question the foreman answered in the affirmative. The trial judge then instructed the jury that it should proceed to correct its verdict and that if it intended to find against both the Local and the International it should list them separately, but that if it intended to find against one union only, namely the Local, no change was required. The jury was also then instructed that if it intended to find in favor of the three individual defendants it should list their names on the other form of verdict.[37] The court later explained, however, that with respect to the individual defendants "they should be listed on one form or the other, whichever it is your feeling."[38] The judge thereupon directed the jury to "retire and complete the filling out of the forms" and that "As soon as you have them filled out the way that you intend them to be filled out, return them and we will resume the proceedings."

The record discloses that the jury then left the courtroom

[37]The colloquy between the judge and the jury indicates that the form providing for a verdict in favor of defendants had not been filled out at all.

[38]The court also stated as follows: "So, in effect, you write all five names down either on one sheet of paper or the other, but you write each of the five Defendants once."

at 11:35 p.m. and returned to the courtroom the next day at 11:10 a.m., at which time it announced that it had reached a verdict. The verdict, as read by the clerk, declared that the jury found in favor of plaintiff and assessed compensatory damages against all five defendants in the sum of $285,000 (each defendant was listed separately), and assessed punitive damages against defendants as follows: "East Bay Union of Machinists, Local 1304, $4,000.00; United Steelworkers of America, $20,000.00; Lloyd Ferber, $0; William F. Stumpf, $0; Dave Arca, $0." The jurors were then separately polled as to each defendant individually as to whether it was their verdict with respect to the compensatory damages. In each instance the 10 jurors declared it was their verdict and the two that it was not. (The 10 assenting and the two dissenting were the same in each instance.) The jurors were then polled as to the verdict on exemplary damages with respect to the Local and the International in the same manner and their assents and dissents in each instance were the same as on the polling with respect to compensatory damages.[39]

Defendants do not point out how they were prejudiced by the manner in which the verdicts were returned except to state that the jury was apparently confused and that the conclusion is warranted that the jury felt that the court was criticizing them for not having listed all five defendants on the form finding for plaintiff and that "they returned their second verdict to so oblige." We find no basis for this assertion, nor do we perceive any prejudicial effect in the proceedings relative to the reception of the verdict. ██ In the instant case the trial court followed the proper procedure when the jury first returned with a verdict which was clearly insufficient. "The proper procedure where an informal or insufficient verdict has been returned is for the trial court to require the jury to return for further deliberation." (*Brown* v. *Regan*, 10 Cal.2d 519, 523 [75 P.2d 1063]; *Bisnett* v. *Hollis*, 207 Cal.App.2d 142, 150 [24 Cal.Rptr. 231]; *Mish* v. *Brockus*, 97 Cal.App.2d 770, 776 [218 P.2d 849]; Code Civ. Proc., § 619.) ██ The trial court retains control over the proceedings with power to procure correction of informal or insufficient verdicts until the verdict is recorded and the jury is finally discharged. (*Sparks* v. *Berntsen*, 19 Cal.2d 308, 313

---

[39]Counsel for defendants announced that he did not wish the jury polled as to the verdicts on exemplary damages with respect to the three individual defendants.

[121 P.2d 497]; *Brown* v. *Regan, supra,* at p. 524; *Crowe* v. *Sacks,* 44 Cal.2d 590, 598 [283 P.2d 689]; see Code Civ. Proc., § 618.) ▮ The action of a judge in the correction of verdicts should be taken with caution, i.e., he must not throw the weight of his influence into the deliberations of the jury as to matters exclusively within its province. (*Crowe* v. *Sacks, supra,* at p. 598.) A review of the record in the instant case discloses that the trial court exercised its duty in sending the jury back for further deliberations and that in doing so it was careful not to influence the jury's deliberations or to interfere with the jury's prerogative. The verdict of the jury in the instant case was the second one, i.e., that which was finally recorded. (Code Civ. Proc., § 618; *Crowe* v. *Sacks, supra,* at p. 599.) As to this verdict each of the jurors was meticulously polled and ten of the jurors expressly announced that it was their verdict.

*Should the Cause Be Remanded for Retrial on the Issue of Exemplary Damages?*

▮ *Yes.* The award of exemplary damages must be reversed because the jury was erroneously instructed that the collective bargaining agreement was terminated and that it was not breached by Fibreboard. Whether the agreement was terminated and whether it was breached by Fibreboard were questions vital to the issue of provocation. As hereinabove discussed acts of provocation are to be considered in reduction of, or setoff against, punitive damages.

▮ An appellate court has power to remand cases for retrial on a single issue such as damages (*Little* v. *Superior Court,* 55 Cal.2d 642, 645 [12 Cal.Rptr. 481, 361 P.2d 13]; *Mondine* v. *Sarlin,* 11 Cal.2d 593, 600 [81 P.2d 903]), and this power includes a retrial on the limited issue of exemplary damages. (*Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 801 [197 P.2d 713].) ▮ In the present case the jury has properly found that a tortious act was committed by all defendants, and has properly determined the amount of general damages against all defendants. The retrial of the issue of exemplary damages is only required, therefore, as to the defendants against whom punitive damages were awarded by the first jury, namely, the International and the Local. ''Upon a retrial of the issue of exemplary damages it is only necessary for the second jury to be advised of the amount of general damages already awarded in order that it may main-

tain a reasonable relation between such damages and the exemplary damages, if any, that it awards.'' (See *Brewer* v. *Second Baptist Church, supra,* at p. 802.) Although we have held that no error was committed with respect to the instructions relative to the defense of provocation, we suggest that upon the retrial appropriate instructions be given to the jury on this question consonant with the principles we have herein discussed.

The judgment is reversed insofar as it decrees the recovery of exemplary damages in the sum of $4,000 from defendant East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO, an unincorporated association, and in the sum of $20,000 from defendant United Steelworkers of America, AFL-CIO, an unincorporated association; and the trial court is directed to retry the issue of exemplary damages only against said defendants. In all other respects the portion of the judgment appealed from is affirmed. Respondent, Fibreboard, is to recover its costs on the appeal of defendants Ferber, Stumpf and Arca. Each side is to bear its own costs on the appeal of defendants East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO, and United Steelworkers of America, AFL-CIO.

Bray, P. J., and Sullivan, J., concurred.

A petition for a rehearing was denied June 26, 1964, and appellants' petition for a hearing by the Supreme Court was denied August 5, 1964.